[Civ. No. 2062. Third Appellate District.—April 3, 1920.]

In the Matter of the Estate of GEORGE A. LITTLE, Deceased. CLARA M. SPARLING, Appellant, v. JOSEPH H. STEPHENS et al., Respondents.

[1] NONSUIT—WHEN MAY BE GRANTED.—When once a plaintiff has adduced such evidence as if uncontradicted would justify a verdict, no amount of contradictory evidence will justify the withdrawal of the case from the jury.

[2] ID.—CONTEST OF WILL—CONSIDERATION OF EVIDENCE.—On a motion for a nonsuit, particularly when made on the close of the plaintiff's, or, in the case of a will contest, the contestant's, case, in determining whether the evidence presented is sufficient to take the case from the jury, the entire evidence presented is to be viewed from a point most favorable to the plaintiff or the contestant. In other words, a nonsuit may be granted only when, disregarding conflicting evidence and giving to plaintiff's or contestant's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of any substantiality to support a verdict in favor of plaintiff or contestant if such verdict were given.

[3] WILLS — TESTAMENTARY CAPACITY.—If the testator is able to understand and carry in mind the nature and situation of his property and his relation to his relatives and those around him with clear remembrance as to those in whom and those things in which he has been mostly interested, capable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty, free from any delusion, the effect of disease, which might lead him to dispose of his property otherwise than he would if he knew and understood what he was doing, he has the capacity to make his will.

[4] ID.—LEGITIMATE INFERENCE DEFINED.—By legitimate inferences are meant those inferences that necessarily follow from certain evidence—legal inferences that are reasonably and legally to be drawn from the evidence.

[5] ID.—CONTEST OF PROBATE — EVIDENCE — INTOXICATION — NERVOUS SHOCK—INTELLIGENT COMPREHENSION OF ACT.—In this proceeding contesting the admission to probate of a holographic will, although the evidence introduced by the contestant showed that the testator had been addicted to the use of intoxicating liquors and that he

3. What constitutes testamentary capacity generally, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

had suffered a severe nervous shock as the result of the reverses with which he had met, and which had reacted upon his mental and physical condition, there was no evidence from which the inference necessarily followed that he had no intelligent comprehension of what he was doing when he wrote his will, while the will itself was mute but convincing evidence of the fact that he fully comprehended what he was doing when he wrote it.

[6] ID.—SUICIDE — INSANITY — TESTAMENTARY CAPACITY — BURDEN OF PROOF.—The fact alone that the testator committed suicide does not prove that he was insane; neither is it true that no person who is insane may make a valid will. To sustain the position that one not entirely sane has not made a valid testamentary disposal of his estate it must be clearly shown that, at the time of the testamentary act, he was insane to the extent that he was mentally incompetent to do so.

[7] ID.—IRREGULARITY OF HANDWRITING—MENTAL COMPETENCY.—The fact that in the testator's handwriting as shown by his will there is evidence of nervousness or unsteadiness and for that reason he did not form the letters in the words as evenly or regularly as was his custom proves nothing as against the proposition that he was mentally competent to make a will at the time he wrote the document in question.

[8] ID.—MISSPELLING NAME OF DEVISEE—TESTAMENTARY CAPACITY.— The circumstance that the deceased, in his will, spelled the first name of one of the devisees, a nephew, erroneously, does not possess any significance as showing his mind to be unbalanced to a degree that he was without testamentary capacity when he wrote the will.

APPEAL from a judgment of nonsuit of the Superior Court of Sacramento County and from an order admitting a will to probate. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

Brittain & Kuhl, Max J. Kuhl and Wachhorst & Wachhorst for Appellant.

Elliott & Atkinson for Respondents.

6. Suicide as bearing upon question of testamentary capacity, notes, 24 L. R. A. 577; 27 L. R. A. (N. S.) 94.

Insanity as evidenced by suicide, notes, Ann. Cas. 1912A, 44; Ann. Cas. 1916E, 488.

HART, J.—This is a proceeding in which the admission to probate of the holographic will of George A. Little, deceased, is contested by Clara M. Sparling, a sister of the decedent. At the close of contestant's case, the court granted a motion for nonsuit, made by the proponents of the will, and admitted the will to probate. The appeal is by contestant from said order granting a nonsuit and from said judgment.

The grounds of contest were two, viz.: (1) That at the time of the making of the will said George A. Little was not of sound and disposing mind, in this, that he was under the influence of alcoholic drinks and other intoxicants to such a degree that he did not know what he was doing at the time; (2) That on the date of said will, and for several months prior thereto, decedent was mentally incompetent to execute a will and was diseased in mind to such a degree that he was lacking in testamentary capacity and was insane.

On the morning of October 30, 1917, George A. Little was found dead in the kitchen of his home near Fair Oaks, Sacramento County. He had committed suicide by attaching a piece of twine to the trigger of a shotgun, placing the muzzle of the gun in his mouth and pulling the string with his left hand. He left an estate valued at from thirty-five thousand dollars to forty thousand dollars.

George A. Little was born near the town of Dixon, Solano County, in about 1871 or 1873. He was educated in the schools of Dixon and subsequently took a year's course in a business college in San Francisco. He returned to Dixon and was employed for a time in the Bank of Dixon and afterward in the Bank of Antioch. About 1890 or 1892 he conducted a grocery-store in Dixon and, in 1902 or 1903, went into the grocery and saloon business in the city of Sacramento, with a partner named Maltby, and remained in that business for fourteen years. The division of the duties of the partners was such that Little ran the saloon and liquor business while his partner attended to the grocery-store.

In April, 1916, when Little was about forty-four or forty-five years of age, he for the first time married. After his marriage he gave up the saloon business and, in the fall of 1916, removed to a ranch which he owned near Fair Oaks. Shortly thereafter his wife became ill and was twice

taken to a hospital in San Francisco, where she died on July 1, 1917. After the burial of his wife decedent returned to his home at Fair Oaks. While living there, his barn and contents were destroyed by fire and, about the middle of October, 1917, a new automobile was stolen from him.

When the deputy coroner was called to the house of decedent, on the morning of his death, he found in the pocket of a coat hanging on the kitchen door a number of letters, a bank-book, and the will in question. The deputy coroner testified that the paper upon which the will was written looked like letter tablet paper. Among the letters found was one which is called a "farewell letter," written by deceased to his sister, Edna. The will is brief and is as follows:

"Fair Oaks
"September Twenty Ninth
"Nineteen hundired and Seventeen.
"My first and Only Will & Testament.
"I give & bequeath to my Nieces and Nephews. Harlod & Robert—Stephens Ranond. Ralpha & Ruth Little Dorathia Little Sixty acres of land. near. Dixon. Share & share alike.
"The. residue. or. balance. of the estate to go to my Sister Mary. Edna. Stephens.
"to use and do. with as. she. may choose.
"And to give no bonds.
"GEO. A. LITTLE."

Appellant contends that the will, "Contestant's Exhibit No. 1," "bears unmistakably stamped upon it an incoherent, uncertain, vacillating, legally incompetent mind."

We will now give, in as concise a manner as possible, the gist of the testimony introduced on behalf of the contestant, in addition to the facts above epitomized.

J. E. Davies, owner of a machine-shop in Sacramento, testified that decedent had bought from him a gas engine and some time later had told witness that it was not working well; that witness sent a man to look at the engine, who reported that everything was all right. About a week and a half or two weeks before his death Little came to Davies' office. The witness said that decedent spoke about the fire, the shortage of men and shortage of material and was very much excited; that he waved his hands, walking up and

down the floor, and said: "This business is driving me crazy." Witness said Little was wholly irrational for a few minutes at the time of that conversation; that he thought he was intoxicated but it proved that he was not; that after they "got him toned down to a reasonable condition" he discussed matters very satisfactorily.

William Mullenney testified that he had known George A. Little for seventeen or eighteen years, very intimately for ten years; that during the last year of his life he had seen him only once, which was in October, when his automobile was stolen; that at that time decedent was irrational, seemed to be laboring under a great deal of excitement and was a great deal thinner than when witness had seen him before; that "he seemed to be kind of staring like."

William Winn, a machinist's helper, employed by the witness, Davies, testified that decedent bought an engine in the shop in August, 1917; that in about a week "he came back roaring. By roaring I mean that he was up in the air; . . . he was profane and swearing." Davies sent a man out to look at the engine and in about one week Little again came to the shop. Witness said: "He was excited. The way he went on was something fierce. He commenced swearing. I got him by the shoulder and took him over to the bench and told him to cool down." Again a man was sent out to look at the engine and in September, about a week before he killed himself, Little returned to the shop. At that time he told about the fire and about his wife being dead, and said: "My bad luck, I lost my wife, I got this fire, I lost everything." Witness said he was "awful flighty, and pale as a ghost and had been drinking"; that he waved his arms and witness grabbed him by the shoulder and held him; that he walked up and down pulling his hair; that on one occasion he said: "What in hell can I do? Is this man that keeps this place crazy or am I crazy?" The witness testified that he said to Little: "If I had as much money as you have I would not worry," to which Little replied: "To hell with it! I don't know who is going to get my money. The saloonmen will get it."

Another employee of Davies was Walter Marx, who testified that Little was in the shop and complaining that the engine he had would not run. Witness went out and coupled the batteries up to the engine, "turned it over and away it

went. There was nothing wrong with it. There was nothing unusual about Mr. Little's demeanor or conduct during the time I knew him only he was forgetful. I would show him how to start the engine and then when it came to him starting it he had forgotten what I had shown him. This happened upon two occasions.''

G. W. Shouse had worked for Maltby & Little as a grocery clerk for seven or eight years. He said that during that time ''Mr. Little was a drinking man. I don't mean he was a man to be drunk all the time. What I mean is that he was a man that took his drinks as an ordinary man would that is running a saloon.'' Witness met Little several times after February, 1917. He testified: ''I noticed a change in the appearance of George Little after the death of his wife. He seemed to be downhearted like any man would and he told me that he lived out to the ranch all alone; he said it seemed to be very lonesome and he was stating about what bad luck he had had, losing his wife and his barn burning down, and I believe something about his automobile burning up; and he said that a man having the luck that he had, life wasn't worth living. He stated that sometimes he felt like going down to the river and jumping in the river. The last time that he said this was not more than three days before he committed suicide. At that time he looked bad, was very peaked in the face and did not look well; . . . he was kind of trembly like, nervous—shaky like.''

Ernest Parker testified that he knew Little in his lifetime; that he last saw him two or three weeks before his death; that he seemed sad and downhearted, grieved over the death of his wife; that he also mentioned the loss of his barn by fire. ''Before the death of his wife he was of a jolly nature, talkative, and very sociable. After the death of his wife he was very sad. The last time I saw him he was rational.''

John Hedigan testified that he had known George Little for about twelve years. Witness was stopping with Jeremiah Kenealy, who owned the adjoining farm to that of decedent. For three weeks previous to the death of George Little he and witness slept in the same bed at Kenealy's house. On the night of October 29th, the night before the suicide, Mr. Kenealy's house being filled with company, witness and George Little slept in the same bed at Little's home. The

witness said that during the three weeks previous to Little's death he "acted pretty strange sometimes, to me. The last night I slept with him I thought he was insane—well, in fact for a couple of weeks, he kept jumping, and one thing another. He jumped in bed and acted funny. He would jump in bed at night-time and then he would ask me if they kept me awake; . . . that happened almost every night I slept with him. . . . Little groaned at night-time; he was wide awake several times when he was groaning; sometimes he would be lying down and sometimes sitting up; the groaning continued pretty near all night." On the night before the death of decedent witness said that at about twenty minutes to 1 o'clock Little got up and said: "I have got to go out here a little while to the kitchen"; that he went out of the room, was gone about fifteen minutes and returned; that at about 5 o'clock Little said: "I am in awful trouble. Did they keep you awake?" to which witness replied: "No, George." At about 6 o'clock in the morning witness arose first, dressed himself and said: "I will see you over at breakfast, George," to which decedent replied: "No, I don't think you will, Jack. I don't feel just right." Witness said it had been customary for Little to eat his breakfast at the Kenealy home. He testified that Little was a drinking man; that every day he was in Sacramento he saw him take a drink of whisky. He said that the evening before the suicide Little told him he was going to stay home that night, that he had writing to do.

Jeremiah Kenealy stated that at one time after the death of Little's wife he and Little were together at a saloon in Folsom and drank some beer; that Little acted strangely. He said: "George comes and started something like, I don't know, I think it was a dog around, and touched his leg, or something, and I said: 'What is the matter, George?' 'Oh,' he says, 'I am awful nervous; I wish I could take a drink of whisky. I was up all night. I don't feel good,' so he took a whisky." Later on they took two more whiskys.

Howard C. Tarry, an automobile repair man employed in Fair Oaks, testified as to having worked on Little's automobile and being called to his place to start a gasoline engine. The first time he found the engine was not put together right and fixed it. At another time Little called to get witness to go out to start the engine. Witness testified:

"I rode out with him; it is about four miles and very hilly; I would not ride back with him. He drove very recklessly and I grabbed the wheel and pulled the machine back into the road several times—a couple of times." Witness said that Little jumped around the engine at his place and was nervous; that it was necessary to remove part of it and he was so nervous that he could not put the parts back again; that there were several nuts to be put on and that Little could not hold the nuts in his fingers to start them on the threads. At another time Little had taken a spark-plug to pieces and put it back wrong. Witness said: "Upon these occasions I could not notice that he was irrational but it wasn't in the way he usually acted."

E. W. Braden testified that after Little lost his wife his conduct and demeanor were not exactly the same; that he was nervous, easily frightened, and he seemed to think every thing was going wrong about the place.

J. A. Reed told of an occasion when Little was sitting in an automobile, in August of 1917, "apparently waiting for Mr. Johnson to come out of the house, and he took a paper out of his pocket. I took it to be a pack of cigarette papers, and he looked at them, throwed them down on the bottom of his machine, and commenced talking to himself and motioning with his hands."

Clara M. Sparling, the contestant, testified: "During the last three or four years of my brother's life I saw him quite frequently. I knew his wife. He didn't visit me, but I always went to see him at his place of business. . . . I judged the relationship between my brother George and his wife was very affectionate. I was present when she died. My brother telephoned to me to come; he telephoned me that his wife was dying. I saw a good deal of my brother George shortly after his wife's death and while the funeral arrangements were being made. My brother had been a drinking man in his lifetime. During the last ten years of his life I have talked to him about his drinking and asked him for his general health's sake not to drink. . . . During those last ten years of his life I have seen him under the influence of liquor; not frequently, because I did not see him every day. . . . When I arrived at the hospital in San Francisco where his wife died he was very much under the influence of liquor. After that he still continued

to drink more or less until I left after the funeral. I believe the last time I saw George was at the State Fair. He was not intoxicated but his general health, his appearance—he was nervous and shaking. I felt sorry because he looked so miserable. When he shook hands with me you could feel his bones through his coat. . . . At the time of his wife's death he was very nervous and crying and said he was going to commit suicide. . . . On the day after his wife's death my brother had had a few drinks. He was not appreciably under the influence of liquor, but he was in a very nervous, sick condition. . . . Before his wife's death George was a very healthy looking person, what you would call rather stout. When I saw him at the State Fair his eyes were all drawn down and his face was thin and he was shaking all over his body. . . . In my opinion, during the months following the death of George's wife, I do not believe that he was entirely sound on account of sickness and liquor.''

C. M. Johnston was foreman on George Little's ranch between nine and eleven days after the 15th of August, 1917. He said that Little was rather excitable; that he walked up and down with his head down and talked to himself, making motions with his hands. On several occasions decedent said: ''I will take the gun and blow my head off and end it all.'' Witness had known Little for about three years prior to his death. When he met him at the store, decedent ''seemed to be a sociable, jolly man and was stout and his cheeks were full of color, kind of rosy. He had a florid complexion, a very ruddy and rosy complexion. During the last year he seemed to be worried and thin and did not look like the same man. He didn't seem to have any color left; he was pale and there was a big difference in his weight. He was a good deal thinner.'' Witness told about Little's attempts to fix engines; that he would pull them apart and could not put them together again. ''When the engine was working he couldn't let it alone; he would stop it and it would not work right, and this ought to be done and that ought to be done, and the first thing you know it would not work at all.''

Mrs. C. M. Johnston, who lived at Little's home during the time her husband was foreman, testified that decedent was nervous; that the first day she was there he spoke about his late wife, said he had had poor luck, wrung his hands

and said this was a weary world. On the next day the engine broke down and Little came into the kitchen to telephone, but the line was busy and he paced the floor and wrung his hands and said that he would take a gun and blow his brains out. "He was reticent, as a rule. He was not jovial. He seemed melancholy. His spirits were not lively; his spirits were depressed nearly always. Upon the second occasion he said he was going to commit suicide, and he repeated that statement. This was a daily occurrence."

Dr. Fred P. Clark, an alienist, for twelve years superintendent of the state hospital of the insane at Stockton, was asked a hypothetical question embodying the facts above detailed, and said that in his opinion, at the time the will was written, George A. Little was insane.

The rule as to motions for nonsuit is stated as follows (and which statement of said rule is affirmed in *Estate of Chevallier,* 159 Cal. 161, 167, [113 Pac. 130]), by Mr. Justice Barry in *Dublin etc. R. R. Co.* v. *Slattery,* L. R. 3 App. Cas. 1155: **[1]** "When once a plaintiff has adduced such evidence as if uncontradicted would justify a verdict, no amount of contradictory evidence will justify the withdrawal of the case from the jury."

In *Schuchardt* v. *Allens,* 1 Wall. 359, [17 L. Ed. 642], it is said: "If the evidence be not sufficient to warrant a recovery, it is the duty of the court to instruct the jury accordingly. This is equivalent to a demurrer to evidence, and such an instruction ought to be given whenever the evidence is not legally sufficient to serve as the foundation of a verdict for the plaintiff." (See, also, *Byrnes* v. *Moore,* 93 Cal. 393, [29 Pac. 70] ; *Archibald Estate* v. *Matteson,* 5 Cal. App. 441, [90 Pac. 723].)

**[2]** It is true that, on a motion for a nonsuit, particularly when made on the close of the plaintiff's, or, in the case of a will contest, the contestant's case, "in determining whether the evidence presented is sufficient to take the case from the jury, the entire evidence presented is to be viewed from a point most favorable to the contestant. (*Estate of Ricks,* 160 Cal. 450, [117 Pac. 532].) Disregard is had of any contradictory evidence." (*Estate of Ricks,* 160 Cal. 450, [117 Pac. 532] ; *Estate of Arnold,* 147 Cal. 583, [82 Pac. 252] ; *In re Ross,* 173 Cal. 178, 179, [159 Pac. 603].) In other words, a nonsuit may be granted "only when, dis-

regarding conflicting evidence and giving to plaintiff's [contestant's] evidence all the value to which it is legally entitled, herein indulging in every *legitimate* [we italicize the word 'legitimate'] inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given.'' (*Estate of Caspar,* 172 Cal. 147, [155 Pac. 631]; *In re Ross,* 173 Cal. 179, 180, [159 Pac. 603, 604].)

[3] Testamentary capacity or what constitutes the mental capacity to make a will has been lucidly explained in *Estate of Motz,* 136 Cal. 562, [69 Pac. 294], in a quotation from the case of *Whitney* v. *Twombley,* 136 Mass. 145, as follows: "If he [the testator] is able to understand and carry in mind the nature and situation of his property and his relation to his relatives and those around him with clear remembrance as to those in whom and those things in which he has been mostly interested, capable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty, free from any delusion, the effect of disease, which might lead him to dispose of his property otherwise than he would if he knew and understood what he was doing, he has the capacity to make his will.''

Putting the evidence presented herein by the contestant to the test of the foregoing well-established and, indeed, elementary, principles, it seems very clear to us that but one conclusion can justly follow, and that is that the court below made no error of law in taking the case from the jury.

The substantial facts as they were revealed before the court by the testimony submitted by the contestant are given in considerable detail above, and the sum of all that testimony, when reduced to its real evidential purport, is: That the deceased, a man of such education and intelligence as that justification was found for his employment as the cashier, at different times, of two different banking institutions, a position concededly of great importance and responsibility, and who later became engaged in mercantile pursuits, and whose capabilities and experience as a business man were of such high degree and value as to enable him to succeed, before passing the meridian of life, in accumulating a comfortable fortune, had suddenly met with a

series and variety of reverses which so shocked his nervous organization as to have worked changes in his physical and mental characteristics; and as to his condition in those respects as thus brought about the facts are these: That he had been, during some of the years prior to the date of his self-inflicted death, addicted to the use of intoxicating liquors; that he had retired from the mercantile business and taken up farming or fruit-raising, and that comparatively late in life—that is, after he had passed his fortieth year—he took to himself a wife; that, after having been married for a period only of a little more than a year, death claimed his wife; that shortly thereafter the stable located upon his farm was destroyed by fire, this misfortune being shortly followed by the theft of an automobile owned by him; that following all these troubles and misfortunes, coming as they did in rapid succession, he appeared to grow discouraged and despondent, and perhaps plied himself more liberally with intoxicants than he had ever been accustomed to indulge in prior to the date of the advent of adverse inroads into his life and his affairs; that he lost flesh and also displayed mental peculiarities to which his mind was a stranger prior to the time at which the misfortunes referred to came to him; that, according to some of the witnesses, he acted rationally at times, but that such irrational moments were of limited duration; that he, on one occasion, when dwelling on his misfortunes, wrung his hands and talked to himself, and on another occasion, while under a great nervous strain, he exclaimed that "all these things" (meaning his misfortunes) would drive him crazy; that on another occasion he complained that an engine or tractor used on his farm was out of order and would not perform its work, and that, when taken to a machinist for inspection and repair, the latter found the machine intact in all respects—in other words, in perfect workable order.

The above, we repeat, is about all that can be said that the oral evidence shows as tending to establish the mental incompetency of the deceased to perform or execute the testamentary act, save and except the testimony of a physician who testified, basing his testimony upon a hypothetical question, that in his opinion the deceased was insane, but as to this character of testimony the supreme court, in *Estate of*

*Dolbeer,* 149 Cal. 227, 243, [9 Ann. Cas. 795, 86 Pac. 695, 702], has justly declared: "The witnesses were skilled alienists, it may be conceded, but the evidence thus adduced of one who has never seen the person and who based his opinion upon the facts given in a hypothetical question is evidence the weakest and most unsatisfactory. Such questions themselves are always framed with great particularity to meet the views of the side which presents the expert. They always eliminate from consideration the · countervailing evidence which may be of a thousand-fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose, and that purpose never is the presentation of all the evidence. It is never to ·present the fair and accurate view, but the purpose always is to frame a question such that the answer will announce a predetermined result. This kind of expert testimony, given under such circumstances, even the testimony of able · and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value." (See, also, *Estate of Chevallier,* 159 Cal. 161, 170, [113 Pac. 130].)

Some of the witnesses for the proponents, speaking of the peculiar actions or conduct of the deceased prior to the date he wrote his will, testified that, while on certain occasions he acted very peculiarly and like one laboring under a severe nervous and mental strain, he did not appear to be irrational. There is no positive testimony that he was under the influence of intoxicating liquor when he wrote the will whose validity is here challenged.

What are the legitimate inferences from all the testimony? **[4]** By "legitimate inferences" are meant those inferences that necessarily follow from certain evidence— legal inferences, that are reasonably and *legally* to be drawn from the evidence.

**[5]** It is true that it appears from the oral evidence that the deceased had suffered a severe nervous shock as the result of the reverses with which he had met. He was undoubtedly much discouraged and very despondent, particularly because of the loss of his wife. But does it follow from this that he was bereft of testamentary capacity at the time he made his will or at all? Does it follow from this condition that he did not know what he was doing when he executed the testamentary act? Is the inference to be indulged that

a man is insane or irrational to the extent that he is lacking in intelligence enough to dispose of his estate by last will and testament because it transpires that at times he has been in a state of alcoholic intoxication? "A person may drink and yet retain his mental faculties. . . . The effect of alcohol and of drugs wears off, and although they may leave the user weakened both in mind and body, yet so long as there has not been destruction of that mentality which the law requires for the making of a will, it cannot be said that the fact that the testator is addicted to the habit of drink or of drugs incapacitates him from making a will. Such fact, alone, does not raise the presumption that the necessary intelligence is lacking. The question to be determined is the mental capacity of the testator *at the time* he makes his will, and the fact that he may then be under the influence of liquor does not invalidate his testament unless he had no intelligent comprehension of what he was doing." (1 Alexander on Wills, sec. 350.)

There is, as we have in other words declared, nothing in the testimony from which the inference necessarily follows that the deceased "had no intelligent comprehension of what he was doing" when he wrote his will. To the contrary, the will itself is mute but convincing evidence of the fact that he fully comprehended what he was doing when he wrote it. Indeed, the fact that the will is holographic and that it was prepared by himself in strict accord with the law prescribing the requisites of such a testament—that by it he indicated that he knew that, as the law requires, such a will, to be valid, must be in the testator's own writing and dated by him—is itself well-nigh indubitable evidence that he was very much "at himself" when he drew the instrument and at that time knew precisely what he was doing and how he desired to dispose of his estate. By the instrument he disposed of his entire estate, and some of it by *specific devise* to his *nephews and nieces* (near relatives)', giving the location of the property so devised, and appears to have been able "to understand and carry in mind the nature and situation of his property, and his relations to his relatives and those around him with clear remembrance as to those in whom and those things in which he had been mostly interested." (*Whitney* v. *Twombly, supra.*) Moreover, the disposal of his estate by the testament in question

is not an unnatural one. All the devisees and legatees under his will were closely connected with him by blood. It is true that, in the testamentary disposal, he pretermitted the contestant, a sister, but that fact does not render the disposal an unnatural one, and it must be assumed that he had a reason, sufficient to his mind, for thus omitting her as a beneficiary of his bounty.

[6] Nor does the fact that he committed suicide alone prove that he was insane. It is not true that no person who is insane may make a valid will. (*Estate of Chevallier,* 159 Cal. 161, 168, [113 Pac. 130].) And to sustain the position that one not entirely sane has not made a valid testamentary disposal of his estate it must be clearly shown that, at the time of the testamentary act, he was insane to the extent that he was mentally incompetent to do so.

But counsel for the contestant, in their briefs, make a minute and, withal, an ingenious examination of the handwriting of the deceased, as evidenced by the will and a letter written by him to his sister, Mrs. Stephens, near in point of time to the date of the execution of the will, and so undertake to show and by a comparison of his handwriting in those two documents with a letter written by him to the contestant in July, 1917, when, as is conceded, he was in his natural and normal state of mind, that his handwriting as evidenced by his will was not as regular and symmetrical in form as his letter to the contestant showed was the characteristic style of his handwriting. A photographic copy of the will is reproduced in the record. We have carefully examined and compared it with the handwriting of the letter to the contestant, likewise reproduced. There are, it is true, some evidences in the writing in the will of nervousness or unsteadiness in the manipulation of the pen in the writing of the document, but it will readily be perceived by an inspection and comparison of the handwriting of the will with his letter to the contestant that the only difference between them is that one was written with an unsteady hand and the other when the writer apparently had full command of his physical power. The one was undoubtedly written while the testator was suffering from nervousness, due, no doubt, to the mental and physical strain under which he was laboring by reason of his misfortunes, while the other was written while he was in a normal physical and

mental condition. [7] But the fact that in the testator's handwriting as shown by his will there is evidence of nervousness or unsteadiness and for that reason he did not form the letters in the words as evenly or regularly as was his custom proves nothing as against the proposition that he was mentally competent to make a will at the time he wrote the document in question. All persons, it is undoubtedly true, are, in their handwriting, subject to such imperfections. In other words, it is the rule and not the exception that the handwriting of people is not always uniform or precisely their characteristic style of handwriting. A person, enfeebled from physical illness, would not, generally speaking, write in his usual hand, and the difference would be obvious. In this case, the deceased, for several weeks prior to his death, was admittedly in enfeebled physical health and undoubtedly in a measure and in a sense mentally affected. Besides, he had been more or less under the influence of intoxicating liquors. It is, therefore, not strange or a matter of surprise that he should have been incapable, at the time of writing his will, of so using his hand in writing a letter or a document of any character as to make his handwriting therein altogether the same as his chirography would be when he was in good health and in every respect in a normal condition.

[8] Nor do we think that to the circumstance that the deceased, in his will, spelled the first name of one of the devisees, a nephew, erroneously is to be attached any significance as showing his mind to be unbalanced to a degree that he was without testamentary capacity when he wrote the will. Such a mistake is not uncommon in those in a perfectly normal state, and much more readily is it to be perceived that a mistake of that character may be made by one under the influence of the nervous strain from which the deceased had for some time previously been suffering through the misfortunes with which he had been afflicted.

The burden was on the contestant to overcome the presumption of the testator's sanity at the time he wrote his will. This burden, we think, it will appear clear from an examination of the testimony the contestant has not sustained. In other words, the evidence produced by the contestant is not of "sufficient substantiality to support a verdict in favor of contestant if such a verdict were given."

(*Estate of Caspar,* 172 Cal. 147, 150, [155 Pac. 631, 632], *supra.*) The evidence does not "warrant a recovery," or a verdict for the contestant. (*Schuchardt* v. *Allens,* 1 Wall. 359, [17 L. Ed. 642, see, also, Rose's U. S. Notes].)

The judgment is affirmed.

Ellison, P. J., *pro tem.,* and Burnett, J., concurred.