[Civ. No. 12435–S. Second Appellate District, Division One.—April 15, 1940.]

In the Matter of the Estate of W. E. GARVEY, Deceased. EDDIE GARVEY SMITH, Appellant, v. MILDRED PAULINE FREDERICK, Respondent.

Frank J. Kashare for Appellant.

Julius V. Patrosso and William A. Sherwin for Respondent.

WHITE, J.—From an order admitting to probate the last will and testament of Wallace Edward Garvey following a hearing upon the petition of respondent for probate thereof and a contest filed thereto by the appellant, Eddie Garvey Smith, adult daughter of decedent, this appeal is prosecuted. The grounds of contest were: "(1) incompetency; (2) intoxication to the extent that decedent was incapable of exercising his will and was without testamentary capacity; (3) undue influence; (4) fraud; and (5) that said will was not executed in the manner and form prescribed by law". The court heard the proceeding sitting without a jury, and at the close of contestant's case granted a nonsuit as to the first, second and fifth grounds, and denied a nonsuit as to the third and fourth grounds of contest. Upon the conclusion of the trial the court made detailed findings of fact in favor of respondent upon the last-named grounds and ordered the will admitted to probate.

The will was executed December 22, 1937, and decedent died two days thereafter. At the time of his death decedent was approximately 55 years of age and had resided in Los Angeles County for some two years prior to his death. His previous residence, extending over a period of years, was in the city of Salem, New Jersey, where he had been successively a schoolteacher, principal of the high school, and an employee of the Salem Glass Company, with which latter concern he had been connected as secretary, factory superintendent, and in the sales department. His family consisted of his wife, Lavina Garvey, and the contestant, with whom he resided prior to coming to California. During his years of residence in Salem decedent was regarded as an able business man, "hard-working, sensitive, and given somewhat to moody periods". During these times he was considered as only an occasional user of intoxicants. Through his own efforts he amassed a modest competency, and at the time of his death his estate had a net value of approximately $50,000 in personal property, consisting principally of securities.

The record discloses that decedent was quite active in business until the early part of May, 1935, when he became ill and was hospitalized and operated upon for a cancer of the rectum, which operation is known to medical science as a colostomy and involves a complete removal of the rectum. The effect of this operation was to destroy the normal func-

tions of the body in the elimination of waste matter, and the patient is therefore without power to control the movement of his bowels. Following this operation decedent returned to his home in Salem, and on October 10, 1935, the respondent, a registered nurse, was employed to attend decedent in her professional capacity. She remained in attendance upon him until the following April, during which time decedent's wife was absent for a considerable time on a trip and appellant was also away from home for a period. Determining upon a trip to California in the hope of benefiting his health, decedent, with the knowledge and consent of his wife and daughter, came to Los Angeles in company with the respondent acting in her professional capacity as a nurse. Locating in Long Beach, decedent with his nurse and a housekeeper resided together. In July of the following year decedent and respondent returned East, respondent going to Philadelphia and decedent to his home in Salem. Subsequently respondent was reengaged to act as nurse for decedent, in which capacity she acted for about a week or ten days. During the following month, in response to a telegram from decedent, she again re-entered professional employment and accompanied him to California, where she remained in attendance upon him until his death. On each of the occasions when decedent returned east he lived at home with his wife, and according to her testimony and that of appellant, the relations between him and his family were friendly. While decedent's wife did not come to California until a few days prior to his death, the appellant visited her father on three different occasions from October, 1936, to December, 1937.

During his residence in California decedent became actively interested in the business of producing, processing and marketing sulphur and sulphur products, and at the time of his death was president and secretary, respectively, of two different corporations engaged in this business. He was also interested in racing, and was the owner of several horses which were racing at California race tracks.

Coming now to the last month of decedent's life, it appears that on November 30, 1937, decedent received a telegram signed "Mrs. Smith", requesting him to call her at a Los Angeles hotel. Upon making the call appellant discovered that the sender of the telegram was the appellant, his daughter, who had recently been married. Decedent invited ap-

pellant and her husband to come to his apartment in Long Beach, where they remained for several days. On the day preceding their departure decedent took his daughter, her husband, the respondent and some other friends to the Santa Anita race track, stating that he desired to show them his horses which were stabled there. On that evening, while all the last-named parties were having dinner, a telegram was delivered to appellant which appellant stated to those present was "from the girls at the office". It appears, however, that the telegram was from decedent's wife, and on the following morning appellant and her husband left the apartment, advising that they would return during the day. They did not return, however, but instead telephoned the next day, Monday, and on Tuesday, that they were detained in Los Angeles. On Thursday decedent received a telephone call from his attorney, who stated that the latter had noted in the morning issue of one of the legal papers that decedent's wife had instituted a proceeding to have decedent declared incompetent, and had also filed an action against decedent for separate maintenance. Up to this time decedent apparently had no information that his wife was in California. He thereupon left his apartment and went to the home of friends in a neighboring city. It further appears that during decedent's residence in California and while his wife was residing in the family home in Salem, he had provided for her use the income from certain securities which aggregated approximately $1500 quarterly. These dividends were deposited in a joint account of decedent and his wife in a bank in Salem. Just prior to the last-mentioned arrival of his wife in California decedent had drawn a check upon this joint account which was returned unpaid. Upon making inquiry as to the cause of such nonpayment, he was informed that the check had been dishonored because his wife had closed the account by withdrawing therefrom the entire amount thereof in the sum of $2,400. Following the institution of the divorce and incompetency proceedings decedent directed his counsel to effect a settlement with his wife, as a result of which a property agreement was determined upon which was executed by decedent on the 21st day of December, 1937, three days prior to his demise, and which agreement his wife had executed the preceding day. By the terms of this agreement decedent transferred and conveyed to his wife the real property consisting of the home in Salem, certain stock, and

agreed to pay her $23,000 in cash from the sale of remaining securities. He also assigned to his wife life insurance policies in the sum of $14,000. This agreement contained a provision also that the same should operate as a complete property settlement and release of each of the parties by the other, and each waived his respective right to inherit or administer upon the estate of the other. On the day following, decedent executed his will, the first paragraph of which provided: "I make no provision for my wife Lavina Garvey as I have signed a property settlement with her. I make no provision for my daughter Mrs. F. H. Smith because I have provided an education for her and because she is married and will be amply provided for by her husband and by her mother"; and the second paragraph of which was as follows: "I leave all my property real personal or mixed including stocks and horses to Mildred Pauline Frederick and appoint her as administratrix hereof without bond."

It is unnecessary to give any consideration to the fifth ground of contest, in connection with which the court granted a nonsuit, for the reason that no complaint is directed against the action of the trial court therein.

█ We shall first consider the grounds of contest as to which nonsuits were granted, having in mind in connection therewith the familiar rules announced in *Estate of Lances,* 216 Cal. 397, 400 [14 Pac. (2d) 768], governing the power of the court to grant a nonsuit. It should, however, be borne in mind when reviewing a judgment of nonsuit in a matter such as the one before us, that every person of sound mind over the age of 18 years may dispose of his separate property by will. (Prob. Code, sec. 20.) As was said in *Estate of Nolan,* 25 Cal. App. (2d) 738 [78 Pac. (2d) 456] : " . . . the property of the testator is his to dispose of as he wills, and he is not called upon to consult or satisfy the wishes or views of juries or courts (*Estate of Spencer,* 96 Cal. 448, 452 [31 Pac. 453] ; *Estate of Perkins,* 195 Cal. 699, 709 [235 Pac. 45]) ; and 'whether in the minds of others a will is just or unjust is a matter of opinion, and to permit a jury to determine the question without that substantial evidence which the law requires would be to permit a jury to make the disposition irrespective of the desires of a testator' (*Estate of Donovan,* 114 Cal. App. 228, 233 [299 Pac. 816])."

■ Grounds of contest numbered 1 and 2 may be considered together, as they embrace allegations of general incompetency and incompetency allegedly produced by continuous and excessive use of intoxicants. In this regard there was no testimony by any witness, expert or otherwise, that the decedent was insane, incompetent, or suffered from any hallucinations or delusions at any time prior to or upon the occasion when he executed his will. There was evidence that following his operation decedent drank considerably and was under the influence of liquor a great deal of the time; that he "looked terrible"; neglected his business, and that when he returned home to Salem, New Jersey, in December, 1936, he was "just drinking all the time"; that he would start drinking in the morning when he arose, and during the latter months of his life would continue drinking throughout the day; that he was "getting to the point where it was more hard for him to control his emotions, more and more things upset him and littler things"; that he would become angry and give way to emotional outbursts; that he would on occasions consume as much as four pints of whiskey a day. There was also testimony that he was slovenly in his appearance and habits; neglectful of his person, and would wear soiled clothing; his mental condition was thus described by appellant when testifying as a witness: "His mind was not nearly as quick; he couldn't make decisions; he seemed to avoid issues, and he just wasn't as smart a man as he had been before".

The foregoing furnishes an epitome of the testimony in the light most favorable to the contestant. Giving to it all the weight to which it is entitled, we cannot conclude that the contestant produced sufficient evidence to defeat the motion for a nonsuit as to the grounds of contest now under consideration. ■ Testamentary capacity is always presumed to exist until the contrary is established. The burden is always upon the contestant to show affirmatively and by a preponderance of the evidence that the testator, *at the time of executing the will,* was of unsound mind and that such unsoundness of mind actually affected or controlled his testamentary capacity. The question is not what the testator's mental state *may* have been at the time of the testamentary act, but *what it actually was.* Both of the attesting witnesses testified that at the time of the execution of the will decedent was competent, acting freely, and that his physi-

cal condition appeared to be substantially the same as it had been during the period of their acquaintance with him. Decedent's physician testified that on the day the will was executed decedent was rational and intelligent, and that the cold from which he was suffering was on that day "proceeding downward to a bronchitis and possibly pneumonia". When a clear case of testamentary capacity of decedent at the very time of the execution of the will is made by the evidence of the proponent, the question presented is, did the contestant introduce evidence so inconsistent with and contradictory of that adduced by the proponent that it would have been sufficient to support a verdict or decision for contestant under the "conflicting evidence" doctrine if the jury had seen fit to bring in such a verdict or the court, sitting without a jury, should arrive at such a decision? In the case at bar the evidence was insufficient as a matter of law to sustain a finding for contestant on the issue of incompetency. In *Estate of Carithers*, 156 Cal. 422 [105 Pac. 127], wherein the testimony with reference to overindulgence in alcoholic stimulants was more pronounced than in the case before us, and where the cause of death, which occurred two months after the execution of the will, was ascribed to "acute alcoholism", the Supreme Court, in pronouncing the evidence insufficient to sustain the judgment in favor of contestant, said:

" . . . We do not think that the contestants produced sufficient evidence of *facts* to justify the jury's verdict. It is true that gross habits of indulgence in strong drink were disclosed, but there was nothing which tended to break the force of the positive testimony of the attorney and the attesting witnesses that Carithers was possessed of testamentary capacity when he signed the will. The testimony of the physicians was largely speculative and was founded entirely upon knowledge gained subsequent to August 18, 1906, while the other witnesses depended upon facts which were just as consistent with the theory of temporary drunkenness as of permanent mental derangement. Such evidence is not adequate for the overthrowing of the provisions of a will. *In Re Wilson*, 117 Cal. 262 [49 Pac. 172, 711], lays down the rule for cases of this kind very clearly as follows, 'While evidence of the condition of the testator's mind both before and after the date of the testamentary act is admissible, yet it is important only as it bears upon that condition at the

very time of the execution of the will. It unfortunately is often the case that exceedingly bright and strong-minded people and addicted to the excessive use of alcoholic drinks, and are frequently intoxicated; and to hold that the wills of such persons, although shown to have been executed when they were in full possession of testamentary capacity can be upset by a jury upon mere proof of such drinking habit, would be to carry the rule of "conflicting evidence" beyond all reasonable bounds.' "

Again in *Estate of Smethurst,* 15 Cal. App. (2d) 322 [59 Pac. (2d) 830] (hearing denied by Supreme Court), we find the following: " . . . The habitual use of intoxicating liquor to excess may result in permanent insanity, but to constitute insanity, more than dipsomania must be shown; it must be a condition of fixed mental unsoundness; nor can insanity be presumed from proof of habitual drunkenness, however excessive or long continued. (*Estate of Mahoney,* 6 Cof. Prob. 1.)

"The fact that the testator may have been under the influence of intoxicating liquor at the time he made his will does not invalidate the instrument unless he at that time had no independent comprehension of what he was doing (*Estate of Little,* 46 Cal. App. 776 [189 Pac. 818]) ; and contestants here submitted no evidence in that particular.

"The intoxication of the testator, assuming it to have been established on the day of the execution of the will, must have been of such a degree as to have deprived him of judgment while executing it. It must affirmatively appear that the mind of the testator was totally destroyed, and that he was so far under the influence of liquor at the instant of its execution that he was incapable of comprehending the nature of his act, the extent of his property and those who had a claim upon his bounty. (*Estate of Mahoney, supra.*) "

See also, *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085] ; *Estate of Campbell,* 46 Cal. App. 612 [189 Pac. 812].

■ Testamentary capacity exists when the testator understands the nature and situation of his property; recalls and understands his relation to the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. That the decedent possessed such understanding is fortified by the fact in evidence that on the day preceding the execution of his will he had executed a formal

document in the nature of a property settlement with his wife, which instrument set forth in detail property owned by him and clearly indicated the particular character of so much of his property as was to be transferred to his wife pursuant to the terms of the settlement. That he had both his wife and daughter in mind when he executed his will is evidenced by the fact that in the same he referred to both of them and set forth his reasons for not therein making provision for them. The answer to the opinion of the psychiatrist who testified that from the autopsy performed by him upon the body of the decedent as well as from a comparison of the signatures of decedent on documents other than the will, the signature upon the latter was an ''alcoholic signature'', is contained in the opinion of the court in *Estate of Little,* 46 Cal. App. 776, 791 [189 Pac. 818]. The evidence of overindulgence in alcoholic liquor as reflected in the record before us falls far short of the *quantum* required to establish the fact that decedent had become so weakened in his physical and mental powers that he was incapable of the testamentary act. (*Estate of Fisher,* 202 Cal. 205 [259 Pac. 755] ; *Estate of Putnam,* 1 Cal. (2d) 162, 165 [34 Pac. (2d) 148].) Neither does the evidence in the instant case of repulsive or filthy personal habits, ill temper and a disagreeable disposition constitute insanity or unsoundness of mind. (*Estate of Collins,* 174 Cal. 663 [164 Pac. 1110] ; *Estate of McGuirk,* 50 Cal. App. 352 [195 Pac. 279].) Applying the principles of law herein enunciated to the state of the evidence as here presented, the conclusion is inescapable that the contestant failed to sustain the burden of establishing the fact that at the time of the execution of the will on December 22, 1937, the testator was so mentally incapacitated that he did not possess testamentary capacity. (*Estate of Finkler,* 3 Cal. (2d) 584 [46 Pac. (2d) 149] ; *Estate of Wright,* 7 Cal. App. (2d) 348 [60 Pac. (2d) 434] ; *Estate of Grant,* 8 Cal. App. (2d) 232 [47 Pac. (2d) 508].)

 Appellant next asserts that the will was unnatural and unjust, in that it disinherited appellant, who was the daughter of decedent. In this claim appellant cannot be upheld. The evidence indicates that while decedent was providing for his family and enjoying friendly and harmonious relations with his wife and daughter, shortly before he executed the will here in question his wife and daughter, acting

in concert, without any intimation to decedent of their contemplated action, caused to be instituted proceedings for separate maintenance for the former and to have decedent adjudged incompetent and his wife and daughter appointed as his guardians. This, it might be noted, occurred at a time when the decedent was actively engaged in business in the community in which he resided. Following the institution of the aforesaid proceedings a property settlement was negotiated between decedent and his wife, under the terms of which she received approximately one-half of their property. Irrespective of the motives which actuated his wife and daughter, and regardless of who was at fault, the fact remains, as disclosed by the evidence, that decedent was not on friendly terms with his family at the time he executed his will, but was deeply resentful of their conduct toward him. If decedent had testamentary capacity, and the evidence herein is insufficient to establish the contrary, then in disposing of his own property he had a right to make what by others might be regarded as an unreasonable or even an unjust will. (*Estate of McDevitt,* 95 Cal. 17, 33 [30 Pac. 101]; *Estate of Peterkin,* 23 Cal. App. (2d) 597 [73 Pac. (2d) 897].)

Appellant next directs our attention to the fact that the will was executed shortly before the death of the decedent. The fact that the testamentary document was what is commonly designated as a ''deathbed will'' is not of particular consequence unless the evidence warrants the conclusion that at the time of its execution the testator's condition of mind and body was such as to exclude the existence of testamentary capacity. There is no such showing here. While it is true decedent died two days after the execution of his will, nevertheless the evidence of the subscribing witnesses and of the attending physician was to the effect that the condition of decedent at the time was approximately the same as it had been during previous months. As heretofore noted, decedent had on the day previous to the signing of his will executed before a notary public the property settlement with his wife. Further, the cause of death was pneumonia which resulted from a cold previously contracted. There is no evidence of a wasting, lengthy, or painful disability which ravaged either the mental or physical faculties of the testator.

■ We come now to a consideration of the question of undue influence and fraud, as alleged in the grounds of contest numbered 3 and 4. A nonsuit having been denied as to these issues, the court at the conclusion of the trial made findings that there was no undue influence or fraud exercised by proponent upon decedent in connection with the execution of the will. Appellant contends the evidence was not sufficient to support such findings. In connection with the charges of fraud and undue influence, contestant's pleading alleges in general that decedent became acquainted with proponent approximately two years before the decedent's death; that proponent was a nurse and prior to her employment in that capacity by decedent the relations of the latter with his wife and daughter had been of an affectionate and friendly nature; but when proponent learned that decedent was possessed of property she spirited him away from his family and so poisoned and prejudiced his mind against his wife and daughter that the friendly and affectionate feelings and relations theretofore existing between decedent and his wife and daughter changed, and that decedent formed a dislike, disfavor and aversion for his family; that proponent refused to allow decedent's wife and daughter to see him until the morning of his death; that when decedent became extremely ill on December 22d and "was in a dying condition", the proponent did not remove decedent to a hospital or notify his family of the seriousness of his condition until after, at the instance of proponent and without the request of decedent, "she had written out the document which has here been proposed as the last will and testament"; and if decedent affixed his signature thereto it was done "at the fraudulent importunity of said Mildred Pauline Frederick, and while the decedent's own volition was overpowered by said Mildred Pauline Frederick; that immediately thereafter Mildred Pauline Frederick took said proposed will with her and retained the same in her custody until it was filed for probate herein; that the said Mildred Pauline Frederick did not notify the family of said decedent, and allow the said family to remove the said decedent to a hospital and medical attention and care until he was so far gone that there was no hope of recovery".

We are not directed by appellant to any testimony contained in the record to substantiate the charges of fraud and undue influence, but are asked to infer from a consideration of the

entire case that the will in question was the result of respondent's overpowering influence upon and fraudulent representations to the decedent. It cannot be gainsaid in the case at bar but that the evidence in connection with the charges of fraud and undue influence was, to say the least, in conflict; and no rule of law is more firmly established than the one which precludes an appellate court from disturbing findings when the evidence, although the same may be controverted, contains substantial testimony which if believed, is sufficient to sustain the findings in question. There appears in the record testimony of decedent's attorney and one of the attesting witnesses that no one other than counsel and the decedent were present at the time when the matter of the will was discussed, and that decedent dictated its provisions; that at the time the will was executed there were present only the attesting witnesses and the decedent. It was also testified by decedent's counsel that at no time had he discussed the matter of the will with respondent nor she with him until after decedent's death. One of the subscribing witnesses, who had served as housekeeper for decedent, testified that during the entire time she was employed in such capacity, extending over a period of a year and a half, she never heard decedent and respondent discuss the matter of a will. Testimony was given by respondent that at no time did decedent discuss his business affairs with her or solicit her advice thereon; that she had never seen the will until it was exhibited to her by decedent's counsel following the death of the former. There is also evidence in the record that respondent endeavored to discourage decedent from using intoxicating liquor and at one time succeeded to the extent that for approximately two months decedent abstained from the use of alcohol. Business associates of decedent testified that at frequent conferences held with him respondent took no part therein, and that while occasionally she would be in the room she never entered into the conversation or made any suggestions. However contradictory of the foregoing other evidence might be, it was nevertheless within the power of the trial court to resolve that conflict in favor of respondent if the trial court believed, as evidently it did from the findings, the witnesses who testified as aforesaid.

Appellant urges that because of the confidential relationship existing between the testator and the beneficiary

there arose a presumption of undue influence, but this is not a correct statement of the law. In the absence of evidence of participation by the beneficiary, the presumption does not arise. As was said by this court in *Estate of Burns,* 26 Cal. App. (2d) 741, 749 [80 Pac. (2d) 77] (hearing denied by Supreme Court) :

"There is a well-established exception to this rule, upon which the contestants rely here, to the effect that where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud. As suggested in *Estate of Higgins,* 156 Cal. 257, 261 [104 Pac. 6], a 'presumption of undue influence' arises from proof of the existence of a confidential relation between the testator and such a beneficiary, 'coupled with activity on the part of the latter in the preparation of the will'. However, the confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will. See, in this connection, *Estate of Ricks,* 160 Cal. 450 [117 Pac. 532] ; *Estate of Lavinburg,* 161 Cal. 536, 543 [119 Pac. 915] ; *Estate of Higgins, supra; Estate of McDevitt,* 95 Cal. 17, 33 [30 Pac. 101] ; *Coghill* v. *Kennedy,* 119 Ala. 641 [24 So. 459]."

To the same effect see *Estate of Frank,* 1 Cal. (2d) 34, 36 [32 Pac. (2d) 607] ; *Estate of Jacobs,* 24 Cal. App. (2d) 649, 651 [76 Pac. (2d) 128] ; 26 Cal. Jur., p. 650, sec. 21.

While it may be inferred from the evidence that respondent beneficiary had opportunity to exercise undue influence upon, or make fraudulent representations to the decedent, nevertheless, opportunity standing by itself is insufficient to warrant a finding of undue influence or give rise to a presumption thereof, in the absence of proof of some activity on the part of the beneficiary in the preparation of the will. Appellant's claim that respondent spirited decedent away from his family during the last days of his life is thoroughly contradicted by testimony of the witness Mr. A. C. Palmer, a business associate of decedent, at whose home the latter stayed for a period of approximately two weeks immediately preceding the execution of the will. This witness testified that decedent telephoned him, stating that he was in some

trouble or difficulty, and asked the witness to come to see him. When in response to the call the witness went to decedent's apartment, the latter told him that he had been advised by his attorney that his wife had instituted some legal proceedings, and that he wanted to come to the witness' home until he had time to think the matter over and to talk with his attorney before being served with papers. This witness further testified that it was in response to decedent's request that he took him to his home, where decedent remained until December 21st. This witness also testified that decedent was a man of determined views and insisted upon having his way when giving orders to respondent; and the witness corroborated respondent's claim that she had endeavored to discourage decedent from the use of liquor, and at times would dilute decedent's liquor without the latter's knowledge.

For the foregoing reasons it follows that the judgment from which the appeal herein is taken should be, and it is, affirmed.

York, P. J., and Doran, J., concurred.