[S. F. No. 9884.  In Bank.—March 7, 1922.]

In the Matter of the Estate of FRANK H. GOULD, Deceased.  DORIS ROBINSON, Respondent, v. E. B. GOULD et al., Appellants.

[1] Estate of Deceased Person—Will — Insanity — Evidence — Hypothetical Question.—A hypothetical question, on which medical experts base their opinions of the insanity of the testator, is utterly valueless in a will contest where the facts assumed in it are in conflict with the undisputed facts in the case and are inconsistent with other facts stated in the question.

---

1.  Hypothetical statements or questions to witness testifying as to sanity or insanity, note, 39 L. R. A. 313.

[2] ID.—VERDICT—FORM OF.—The law requires a special verdict in a will contest and a general verdict is unauthorized; and where the only ground of contest is the unsoundness of mind of the testator the jury should find specifically upon the ultimate fact of incompetence.

[3] ID.—INSTRUCTIONS.—In a will contest upon the ground of unsoundness of mind of the testator, an instruction that the jury could take into consideration the unnatural character of the will, without any explanation of how that fact was to be correlated with other facts, might well be misleading.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying probate to a will. Thomas F. Graham, Judge. Reversed.

The facts are stated in the opinion of the court.

Frank Freeman and Walter Drobisch for Appellants.

Joseph A. Brown and Elmer E. Robinson for Respondent.

WILBUR, J.—This is an appeal by the proponents of a will from an order denying probate to that will after a trial of a will contest before a jury and a verdict against the validity of the will. The only ground of contest was unsoundness of mind. The will was dated January 17, 1918. The testator died January 26, 1918. The situation presented by the record is unique in several respects; among others, the will was written by the testator himself on the last day of the trial of a divorce suit between the testator and his wife and immediately after the court had announced its conclusion as to the terms of the interlocutory decree, wherein the wife was awarded alimony and certain portions of the property. The testator had participated in the trial, testified as a witness, and had been under the observation of court attachés, witnesses, and attorneys during the trial, and we consequently have a very accurate picture of his mentality at that time, and in view of his sudden death from a rupture of an aneurism of the aorta nine days after the will was executed and the autopsy performed immediately thereafter, we have the medical reports concerning the condition of the brain itself.

The testator was a practicing lawyer of high standing. He continued the practice of the law up to the time of his

sudden death and at that time and for many years he had been the United States surveyor-general for California, regularly attending to the duties of that office. Some thirty-one witnesses, business associates of high standing, testified in favor of the proponents of the will, that in their opinion the testator at all times was of perfectly sound mind. No business associate or intimate acquaintance testified that in his opinion the testator was of unsound mind.

The testator had four adult children, three by a former wife and one, Doris Robinson, the contestant, a daughter by the wife who had secured an interlocutory decree of divorce on the day the will was executed. The will in question is in the following words and figures, to wit:

"San Francisco, January 17, 1918.

"This is my last will and testament.

"I hereby revoke all wills heretofore made by me.

"To my wife I leave $1—.

"To my daughter Doris I leave one dollar.

"All the rest and residue of my estate I leave to my three children by my first wife E. B. Gould, A. N. Gould and Gladys V. Gould.

"Written entirely by my own hand and thus dated and signed.

"F. H. GOULD."

The contestant relies upon the testimony of two medical experts, Dr. J. D. Ball and Dr. H. C. McClenahan, whose testimony was elicited by answers to hypothetical questions predicated in part upon the uncontradicted evidence in the case and in part upon disputed evidence. It appears from the testimony without contradiction that in 1914 the testator had suffered from a stroke of apoplexy, from which he quickly recovered without any very notable physical evidences of such a stroke except a slight change in his facial expression and a slight interference with his walking. There was some change in his mental characteristics. He was more irritable after the stroke than he had been before. He was not strong and tired more easily. He had separated from his wife eight times before the stroke and finally separated from her in 1911. His daughter Doris used to come to his office for checks to pay the monthly bills of the household and on such occasions he was sometimes greatly irritated by the amount of the bills. It is said that this

was unusual for him. The stroke of apoplexy was evidence of arterial sclerosis, which continued until the time of his death. The aneurism of the aorta was also evidence of the hardening of the arteries and the *post-mortem* examination confirmed the fact that the testator was suffering from hardening of the arteries. He was also suffering from high blood pressure at the time of the execution of the will and this continued up to and caused his death, by the rupture of the aorta, which was already weakened by an aneurism. During the trial of the divorce action on January 17th, the testator became weak and enfeebled and as an excuse for a temporary respite he stated his condition and this statement was taken down by the court reporter. The evidence shows clearly that the testator was not suffering from any delusions or hallucinations of any sort. Neither was he suffering from general insanity or dementia, but it was claimed that he was in such a condition, owing to the hardening of the arteries and blood vessels within the brain itself, and by reason of the high blood pressure, that under circumstances of intense emotion his brain would not function normally. From the physical manifestations on the 17th of January it is deduced that the testator was acting under intense emotion and therefore was in an abnormal mental state. Under these circumstances a will is drawn wherein his beloved daughter is shut off with a dollar. And this abnormal act it is thought is the result of the abnormal functioning of the brain at that time. So that we have, it is claimed, a case of temporary insanity,—we might almost say flashes of insanity accompanying flashes of emotion, or, perhaps more accurately, periods of insanity coextensive with periods of intense emotion.

[1] A consideration of the hypothetical question upon which this conclusion is based will show that it is utterly valueless as applied to the facts of the case, because the facts assumed in the question are in conflict with the undisputed facts and indeed inconsistent with others therein stated, and hence the man described in the hypothetical case is not the testator. The question covers eighteen pages of the transcript, and is too long to be quoted in full, and for that reason we point out its defects. The question assumes: "That he was very fond of Doris, the contestant in this trial, down to the time of his death; . . ." It is

reiterated, ''that this affection between the father and daughter *continued and was very great up to the time of his death.''* (Italics ours.)

The testimony of the daughter is that he told her that if she testified falsely in the divorce action that she would never be anything to him thereafter. She did testify falsely, as he believed, in favor of his wife, her mother, and contestant testified that he never spoke to her as he left the courtroom, and no communication was held thereafter between them. The evidence on this subject will be discussed more fully later in this opinion.

The question further assumes ''that his memory was very poor after his stroke; *that he could not remember anything;* that he made the promise or appointment; that his memory was very poor after his stroke; that he could not remember anything; that he could not remember names; that he forgot appointments; . . . that his memory was poor; that on occasions in 1916 and 1917 he failed to recognize old acquaintances on meeting them although apparently looking directly at them; that he frequently forgot his money . . . '' (Italics ours.)

The question thus assumes that the testator *could not remember anything,* in which case he would, of course, be of unsound mind, and no expert would have been needed to so declare. If it be said that the question as a whole could not be so construed, it is true, for it is elsewhere assumed in the question: ''That Mr. Gould was a lawyer by profession and that during most of the time mentioned was actively engaged in practicing that profession, *and tried lawsuits in court almost to the day before his death;* that he had attained considerable success as a lawyer and was politically prominent for many years, having twice been speaker of the assembly at or about 1893 and having been state building and loan commissioner in 1895 and 1896 and since 1914 to the time of his death *having been United States surveyor-general for California, and actually performing his duties as such to the day of his death.''* (Italics ours.)

It would be difficult to conceive of a lawyer without any memory trying a lawsuit. We cannot therefore tell which of these two inconsistent views of the facts the expert adopted in making his answers or what standard of intelli-

gence and memory between the two extremes he adopted in his answer to the hypothetical question.

The man presented to the experts by means of the hypothetical question is one who, loving and adoring one child and despising the others, impulsively, without other reason than sudden emotion, leaves all his property to his despised children and disinherits his adored one; while the evidence shows that the testator not only had adequate provocation by reason of his daughter's testimony for a cooling of his affection, but also that a definite change in property relations growing out of the settlement and interlocutory decree in the divorce case had occurred, whereby the mother was awarded a substantial part of his property, which the contestant would naturally inherit from her.

The defects in this question by reason of the omission of the occasion and results of the daughter's testimony in the divorce case will be made more manifest by a further statement of the facts shown by the record. The contestant stated as follows: "Yes, sir, just before I started to testify he said, 'I would suffer my right arm to be cut off before I would let my daughter go on the stand.' . . ." During her examination as a witness in the divorce case the reporter's transcript shows the following occurrence:

"Mr. Savage (the wife's attorney): I won't be dissuaded from performing my duty.

"The Court: What is the difficulty?

"Mr. Savage: I am examining this witness and I don't like to have somebody sitting opposite me and telling me it is a damned shame to ask these questions.

"The Court: I did not hear that.

"Mr. Gould: I said it was too bad to put those words in this girl's mouth.

"The Court: I did not hear that language. If I had I should have acted severely.

"Mr. Gould: I realize it.

"*The Court: I think it is a shame that the young lady is called as a witness at all.*

"Mr. Gould: I do too. I would cut my hand off before I would do such a thing.

"The Court: I think there is no necessity for it, but having done so, there is no use talking about it now.

"Mr. Gould: Please stop it.

"The Court: I cannot stop it now. I never called this witness. I have done my best to have you folks arrange your troubles so there would be *no necessity for that which I knew would come.* Proceed, Counsel, your question is leading. . . ." (Italics ours.)

Just before this occurrence the daughter had testified that her father had knocked her mother down, and that on another occasion he had knocked her against the washstand. Her testimony was obviously colored to favor her mother and discredit her father. She testified in the divorce case that she had been compelled to stay out of school because she did not have proper clothing, and on cross-examination she was asked if she had as much clothing as she thought she ought to have, and replied, "Not as many as anybody thought I ought to have." She was then asked the following questions and answered as follows:

"Q. Everybody thought you were poorly dressed? A. I was poorly dressed.

"Q. You were poorly dressed? A. I was poorly dressed.

"Q. Everybody thought so? A. I didn't ask their opinion."

The obvious effort of the witness was to convince the judge that she was so shabbily dressed, because of her father's niggardliness, that she was compelled to stay out of school. On the trial of this will contest, less than a year and a half later, she testified that she had stayed out of school without her father's consent and had lied to him about it; that the reason she stayed out of school was because she was humiliated by the references of her schoolmates to the then pending divorce case between her father and mother, and that when she finally told her father of this he consented that she remain away from school and take private music lessons instead. She further stated that the reason she did not give this testimony in the divorce case was because her father already knew it. She was questioned and answered as follows:

"Q. Why didn't you say it at that time? A. He knew when he gave me permission.

"Q. Why didn't you say it? A. He was there and he knew when he gave me permission. . . .

"Q. Was it harder for you to testify from the stand that he had given you permission to stay out of school than to testify that he hadn't furnished you the money with which

to go to school? A. No, that was why I quit. That was one · reason, and then on account of the divorce, that is another reason; and he knew how I felt about it, and he cried and felt bad for me. . . ."

Is it to be wondered at that a sane man who had cried and felt bad when his daughter had left school because she was humiliated by an action for divorce between her father and mother should bitterly resent that daughter testifying in the trial of that divorce action that she had stayed out of school because he was so stingy that he would not furnish her clothing to wear there?

The significance of this evidence lies in the fact that the medical experts testifying for contestant based their conclusion almost entirely upon the assumption that there was no change in the affection of the father for the daughter and no reason for such change or for a will disinheriting his favored child. We are not left to · mere inference in seeking the cause for his will. The Sunday (January 20th) before he died he told Mrs. Beck, an intimate acquaintance, that he had left Doris out of his will. To this the witness replied that the daughter "would come around some day and tell him' how much she loved him and did not want to testify in the divorce action and that her mother compelled her to and that he would forgive her, and he said, 'It will take a great deal of explaining to set her straight with me. But I didn't leave her' out as a matter of punishment. I am not angry with her, I am just terribly grieved that she had so little sense of honor that she could go on the stand and perjure herself as she did; but that is not the idea. In the settlement with her mother I gave the mother the home and its contents, besides other consideration, and, I of course, expect the home eventually to' go to Doris and that will be her portion of the estate, in my opinion.' " He added, "Doris was a disappointment to him; that she was not honorable."

O. L. Evarts, an attorney at law, testified that in September, 1916, the testator said he had made a liberal offer of settlement to his wife and that he was taking into consideration in making the offer "that he believed his wife would look out for the property he was turning over to her, which he considered about half, and if she looked out for it his children by her would finally get the property." That

the day the interlocutory decree of divorce was *entered* the witness talked with testator, and "He said he had given to his wife more property than he thought necessary, and had done better by her; that he had children by his first wife, and his second wife, and believed the second wife would look out for the children of that marriage, and that they would finally get the property, and he was perfectly satisfied with the settlement with the idea that these children of the second wife would get the property finally.

"He seemed to be well satisfied that the matter was finally adjusted and discussed some of the conditions of the agreement, but these I do not remember, except one that was he paid his wife five thousand dollars partly in money and part in some obligation, and was to pay her seventy-five dollars or one hundred dollars a month."

Dr. J. D. Ball was asked as to the effect upon his opinion if the testator subsequently calmly and understandingly discussed the terms of the will and allowed it to stand and was questioned and replied as follows: "A. If he had discussed it rationally and intelligently and without emotion and had a remembrance of what he had done and took into consideration all of the facts of his association with the various members of the family, it would be different."

It is clear from the record that the medical experts in expressing an opinion relied very largely upon the implied assumption in the hypothetical question that there was no sane or logical reason for a change of attitude on the part of the father toward the daughter. This is manifest by the cross-examination of Dr. H. C. McClenahan:

"Q. Could it be possible that Mr. Gould could have a reason sufficient to himself for changing his affection from his daughter? A. Very much so, but the question does not relate anything of that kind. . . .

"Q. We won't exclude the former relations—we will say that the relations were just as the question expressed them to be—was he of sufficiently strong mind that he could have changed his mind as to that, and changed his affections from his daughter to another member of the family— if he had sufficient reason to himself? A. If there was sufficient reason for it, and he gave valid reasons for cutting his daughter out of the will; no matter what his state of mind was, if the instrument was a logical one for this man

to make, the condition of the man's mind would not enter as a factor. A lunatic can make a valid will, if it is a logical will.

"Q. Then you would think that Mr. Gould, suffering as he was from this trouble, could have sufficient reasons to himself for changing his mind as to his affections for his daughter? A. Yes, sir, if he did that—certainly.

"Q. So that there would be conditions under which this will would be absolutely valid, even suffering as he was from this trouble? A. Yes, sir.

"Q. There couldn't be any question about that in your mind? A. Generally speaking, I should say yes.

"Q. He was of sufficiently strong mind to pass on a reason for changing his own mind? A. I don't think there is anything in the question that would justify me in passing an opinion upon his reasoning capacity.

"Q. Nothing in what question? A. In the hypothetical question.

"Q. You are not passing upon his reasoning qualifications? A. No, I was taking the man's condition, and his emotional stress under which he was on the seventeenth day of January, the date of this will, plus the provisions of the will, in rendering my opinion.

"Q. Perhaps we don't understand one another—I am assuming that these emotions that you speak of could be brought about by some act or conduct on the part of the daughter that would be sufficient to Mr. Gould? A. Yes, sir, and generally are.

"Q. And so far as he was concerned the making of the will under those conditions, he would be of sufficient mind to dispose of his property in that way? A. I don't think you furnish me hardly enough there to pass an opinion, if I have to carry those facts stated in the hypothetical question.

"Q. I am going away from that hypothetical question. A. Are you including—assuming the hypothetical question?

"Q. What I am getting at now is the reasoning operation and quality of the mind we are dealing with—that is, would it be true that a man suffering as he was would have a strong mind enough to act, and act intelligently, and act rationally, under a given state of circumstances—that is to say, even suffering as he was and with the degree of love that he had for his daughter in prior years—something had

come about *that was sufficient to him to change his mind in that regard and make this will,* whether he would have a sufficiently strong mind, suffering under the disease as he was, to make a will that would be valid? A. There is no question about it.'' (Italics ours.)

Without further quotation from the evidence it is clear from what has been stated that there was omitted from the hypothetical question an uncontroverted fact which would have required the contestant's experts to have pronounced the testator sane, namely, that there was a rational basis for the will and for the testator's attitude as therein expressed toward his daughter and wife.

This brings us to a further consideration of the hypothetical question and to appellant's objection thereto. The question, after a statement of the assumed facts as addressed to Dr. Ball, concludes as follows: ''Will you state whether or not in your opinion the man was, on the seventeenth day of January, 1918, of sound or disposing mind and whatever your answer is give your reasons for your answer?'' To this the following objection was interposed:

''Mr. Freeman: We now object to the question propounded to the witness on the ground it is incompetent, irrelevant, and immaterial, and on the further ground it is without foundation and not a subject of hypothetical question, but if subject of hypothetical question, the question itself is incomplete and does not state the evidence in such a substantial way as to satisfy the law. . . .

''A. The individual described in the case presented to me was not of sound *and* disposing mind . . .'' (Italics ours.)

As the question was addressed to Dr. H. C. McClenahan, ''or'' was displaced by ''and,'' so the question was whether the man was of ''sound *and* disposing mind.'' This witness was also shown the will and over the same objection answered, ''I don't think he was of sound mind, nor do I believe he was of disposing mind at the time he executed that will, and under the conditions as stated in the hypothetical question,'' and in giving the reasons for the opinion states among other reasons: ''He made a will that is not consonant with his attitude toward his daughter—his previous attitude— . . . ''

It is claimed by appellants that the hypothetical question invaded the province of the jury, within the rule stated in *Estate of Taylor*, 92 Cal. 564 [28 Pac. 603], and *Nobles v. Hutton*, 7 Cal. App. 25 [93 Pac. 289], but respondent contends that the objection did not sufficiently advise the court that counsel was invoking that rule. We need not determine that matter for the reason that in any view of the case, even if the evidence was admissible, it is insufficient under the facts to support a verdict. It is true, however, that the evidence is weakened by the form of the question and answers, so that it is at least doubtful as to whether the witnesses were basing their answers upon a conclusion of law from an assumption of fact. This may be illustrated by this portion of the testimony of Doctor Ball on cross-examination: "Q. If it were shown to you on the day of the making of his will, he testified fully in an action describing his property fully, so far as he had gone into the matter and during the day while he may have had an attack as stated, of indigestion, or some stomach trouble, he recovered from that and was cheerful, and without emotion, transacted business of considerable consequence, would that have any effect upon your opinion? A. An individual might know the nature of his act; he might know that he was making a will; he might even know the extent of his property within reason and still not be of sound mind, *for the reason that he would not understand or appreciate his obligations to those that were dear and near to him.* In this case particularly there is not sufficient correlation between his conduct prior and subsequent to the diseased condition." (Italics ours.)

While the witness had in mind the correct legal rule, stated in general terms, it is clear his answer is based upon that rule, and that his application of the rule may have been wrong in this particular case. For where the testator knew that the contestant was his daughter, that she was married; that she was her mother's sole heir; that the law required that she be recognized in his will; that he had other children entitled to his bounty; that the burden of supporting the daughter had shifted by the law to her husband; that the interlocutory decree of divorce and property settlement had wholly changed the disposition of his property in case he died intestate, it is clear that he had suffi-

cient appreciation of his obligations to his daughter and his other children to make a will. Whether the witness believed so or not, we cannot tell from the record.

It appears, then, that no witness has pronounced the testator of unsound mind, whatever may have been the status of the hypothetical man described in the question submitted to the experts. The jury also failed to pronounce the testator of unsound mind. The verdict is as follows: "We, the Jury in the above-entitled cause, find a verdict in favor of the Contestant (Plaintiff)." [2] The law requires a special verdict in a will contest (sec. 1314, Code Civ. Proc.) and the jury should have found specifically upon the ultimate fact of incompetence (*Estate of Benton,* 131 Cal. 472, 474 [63 Pac. 775]) and a general verdict is unauthorized (*In re Langan,* 74 Cal. 353 [16 Pac. 188]).

The court by its third instruction told the jury that they could take into consideration whether or not the will was natural or unnatural in determining the soundness or unsoundness of the testator's mind, and by instruction number IV told them that they could weigh the circumstance that he gave his daughter no more than a dollar in determining the soundness or unsoundness of the testator's mind and by instruction number VI, that they could consider the "affection and state of mind" of the testator toward contestant for the same purpose. In view of these instructions, and the fact that the instructions on mental capacity were couched in very general terms, the court might well have given instructions VI and XII, proposed by the appellants as follows:

"If you find from the evidence in this case that the testator bore some ill will or dislike towards one or more of his children, you are instructed that, if the testator was influenced thereby to make his will as he did, and at the time was of sound mind, and did so of his own free choice, his will would be valid, and should be recognized by you. Even if he did it unjustly, or with mistaken opinion as to the matters involved, this would not invalidate the will, but would rather tend to explain why he made his will as he did."

"A will may be considered unnatural when it is different from that which might have been expected by relatives of the testator, or by the jury. But the consideration of that

question is of no importance in a case in which the evidence clearly shows that the testator at the time he made his will was of sound mind, and, therefore, competent under the law to make it. Such evidence is of no moment, therefore, in any case involving the validity of a will unless there is some evidence immediately tending to show mental incapacity.''

[3] The instruction that the jury could take into consideration the unnatural character of the will without any explanation of how that fact was to be correlated with other facts might well be misleading.

While the failure to give these instructions may have contributed to the verdict, and to the miscarriage of justice manifested by the verdict, we base our reversal of the judgment solely upon the fact that it is wholly without support in the evidence.

Judgment reversed.

Sloane, J., Shurtleff, J., Waste, J., Richards, J., *pro tem.*, and Shaw, C. J., concurred.