64 Cal.App.2d 480 (1944)
Estate of FLORA V. LEWIS, Deceased. LOUIS B, FRANC et al., Appellants,
v.
BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION (a National Banking Association), as Executor, etc., et al., Respondents.
Civ. No. 14419. 
California Court of Appeals. Second Dist., Div. One. 
May 24, 1944.
 Albeck and Albeck for Appellants.
 Irwin M. Fulop and S. Ward Sullivan for Respondents.
 YORK, P. J.
 This is an appeal by contestants from an order dismissing their petition for revocation of the probate of the last will and testament of Flora V. Lewis, deceased, after motion for nonsuit made on behalf of respondents was granted by the trial court at the close of contestants' case.
 The record herein reveals that on June 5, 1942, immediately following the death of her husband, Flora V. Lewis executed a will in which she appointed appellant Louis B. Franc, a friend of long standing, as executor thereof, and after making bequests to relatives and friends, she provided that appellants Louis B. Franc and Mary A. Franc should each receive 25 per cent of her residuary estate. This first will was destroyed at the direction of testatrix by attorney Edward Hervey, who drew it for her, and on June 15, 1942, Mrs. Lewis executed a new will in which she reduced the disposition to appellants by 2 1/2 per cent respectively, which percentage was added to the disposition made by testatrix to another legatee.
 On August 1, 1942, Mrs. Lewis executed another will bequeathing sums of money to relatives and friends, devised her home to respondent Sadie Lou Kramer, who was also made *482 residuary legatee, and appointed respondent Bank of America as executor. No mention was made in said will of contestants and appellants Louis B. Franc and Mary A. Franc.
 Mrs. Lewis died on September 28, 1942, and on October 2, 1942, respondent banking association filed its petition for probate of the will of August 1st. Thereafter, Amelia O. Kramer, sister of testatrix, filed her petition in opposition to probate and on December 10, 1942, a stipulation for a dismissal with prejudice of the contest of said Amelia O. Kramer was filed; the said will of August 1, 1942, was admitted to probate, and letters testamentary were issued to respondent bank.
 On March 3, 1943, appellants filed the instant petition for revocation of the probate of said will of August 1, 1942, on the ground that the execution thereof was procured by the undue influence of respondent Sadie Lou Kramer.
 The answers of respondents admitted that appellants were legatees and devisees under the will of June 15, 1942, denied the allegations of undue influence, and as a separate defense alleged that appellants had actual notice in time to have joined in the contest before probate of Amelia O. Kramer.
 The motion for nonsuit herein was made by respondents at the close of contestants' case on the ground that the record contained no direct evidence of undue influence and no evidence from which undue influence could be inferred.
 [1] It is urged that in determining the propriety of the order granting the motion for nonsuit, the court must accept the evidence in the light most favorable to appellants, and that the evidence submitted by them herein constituted a prima facie showing of undue influence, thus casting the burden on respondents to show that the will of August 1, 1942, was not induced by undue influence.
 This point is answered by language in Estate of Baird, 176 Cal. 381, 384 [168 P. 561], cited by respondents, to wit:
 The admission to probate of the will of August 1, 1942, "established prima facie for all the purposes of the contest, that it was duly executed in the manner required by law by a testator who was competent, free from undue influence, etc. The burden of proof was on the contestants to establish its invalidity. It is plain, therefore, that unless the evidence introduced was of such a nature that it would have sufficed to legally support a conclusion of undue influence ... there was no error in granting the motion for a nonsuit." (See, also, *483 26 Cal.Jur. 759.) [2] Generally, the burden of proof as to the issues of fraud or undue influence is on the contestant or the person who alleges their existence and exercise and such burden never shifts, although where contestants establish a prima facie case, the person charged with fraud or undue influence has the burden of meeting it. (Estate of Eakle, 33 Cal.App.2d 379 [91 P.2d 954].) [3] The burden of showing freedom from undue influence in the execution of a will is not cast upon a beneficiary who sustained no confidential relationship toward the deceased, and who did not participate in any way in procuring the execution of the will. (Estate of Fleming, 199 Cal. 750 [251 P. 637]. See, also, Shields' Estate, 49 Cal.App.2d 293 [121 P.2d 795].)
 [4] Appellants herein made no sufficient showing of undue influence in the procurement of the will of August 1, 1942, and their premise that the execution of said will was induced thereby is based upon nothing more than a present opportunity on the part of Sadie Lou Kramer to unduly influence the testatrix and the suspicions engendered by the knowledge that such opportunity existed.
 As stated in Estate of Baird, supra, (176 Cal. 381, 384): The authorities in this state are numerous to the effect that however unnatural a will may appear to be, and however much at variance with expressions by the testator as to his intention with regard to the natural objects of his bounty, it may not be held invalid on the ground of undue influence unless there be an actual showing of that sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution. (Citation of authorities.) This is the well-settled general rule. There is a well-established exception to this rule, upon which contestants rely here, to the effect that where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud. As suggested in Estate of Higgins, 156 Cal. 261 [104 P. 8], a 'presumption of undue influence' arises from proof of the existence of a confidential relation between the testator and such a beneficiary, 'coupled with activity on the part of the latter in the preparation of the will.' The confidential relation alone is not sufficient. There must be activity on the part of *484 the beneficiary in the matter of the preparation of the will. (Citation of authorities.)" See, also, Estate of Arnold, 16 Cal.2d 573, 581 [107 P.2d 25]."
 The evidence adduced at the trial herein reveals that testatrix, Mrs. Lewis, was a semi-invalid, suffering from palsy and was estranged from Amelia O. Kramer, her sister and only close living relative in Los Angeles where Mrs. Lewis resided. Respondent Sadie Lou Kramer was not related to Mrs. Lewis, but had been married to Mrs. Lewis' nephew, Vollmer Kramer, and was the mother of Billy Kramer. Mrs. Lewis' husband died on June 4, 1942, and, as hereinbefore stated, she executed three wills between that date and her own death on September 28, 1942, in all of which respondent Sadie Lou Kramer was named as a beneficiary. The first two wills were drawn by Edward Hervey, an attorney at law, who represented Mrs. Lewis in her capacity as administratrix of her husband's estate. Mr. Hervey testified that when Mrs. Lewis executed the first will on June 5, 1942, she stated in the presence of contestant Louis B. Franc that "Sadie Lou Kramer had been very helpful to her. She was taking care of things to her. She also told me that she (Sadie Lou Kramer) was divorced and she had a boy (Billy Kramer)." Mr. Hervey also testified that respondent Kramer was in the house when he arrived at Mrs. Lewis' home, but that she left very shortly thereafter; that Mrs. Lewis was "very fixed in her impressions and in her mind what she was going to do." Said witness also stated that he went to see Mrs. Lewis at her home between June 10th and June 15th in relation to her will; that a maid and respondent Kramer were there, but that Sadie Lou Kramer was not present at the discussion between him and Mrs. Lewis at which time the latter directed him what to put in the will of June 15th; that he had no discussions with Sadie Lou Kramer regarding either the will of June 5th or the will of June 15th, in which appellant Louis B. Franc was named executor, and in which both Mr. Franc and his wife were bequeathed a substantial portion of Mrs. Lewis' estate.
 Shortly after her husband's death, Mrs. Lewis entered Dr. Herzen's sanitarium or rest-home, presumably to rest. She remained there until July 20, or 21, 1942, when she was removed to respondent Sadie Lou Kramer's home and where she resided for a couple of weeks. It was while Mrs. Lewis was *485 residing at respondent Kramer's home that she executed the will of August 1, 1942, which has been admitted to probate.
 Mr. Franc testified that he had a conversation with Mrs. Lewis after June 15th at which time "She said that Sadie Lou Kramer had made arrangements for her to go to the hospital or sanitarium to rest. She said she didn't want to go, but she has made the arrangements and 'I have got some valuable papers I would like to have you keep for me, while I am away at the sanitarium or rest-home.' She gave me an envelope containing the second will as it was made a few days before, and gave me some stocks and bonds which I had Mrs. Franc deposit in the safety deposit box." Mr. Franc stated that he visited Mrs. Lewis a few days after she entered the rest-home, and that Mrs. Lewis told him in the presence of Sadie Lou Kramer that she (Mrs. Lewis) wanted to go home. "I said, 'You made arrangements to stay here a month.' She said, 'I didn't make arrangements to stay here a month, Sadie Lou made all the arrangements.'" This witness also testified that on several occasions during the month of August after Mrs. Lewis had returned to her own home, he attempted to visit her, but on each occasion respondent Kramer told him that Mrs. Lewis was too ill to be seen; also that he knew nothing about the will of August 1, 1942, until the day of Mrs. Lewis' death.
 Aside from the testimony of respondent Sadie Lou Kramer, who was called by appellants Franc under section 2055 of the Code of Civil Procedure, the record is silent respecting the circumstances surrounding the execution of the will of August 1, 1942, which omitted any mention of appellants. Respondent Sadie Lou Kramer testified that Mrs. Lewis made her own arrangements with Dr. Herzen when she entered his sanitarium where she remained about one month, after which she stayed at respondent's home a little less than two weeks, because she (Mrs. Lewis) "was unable to get a nurse to take over to her own home." This witness denied that Mrs. Lewis asked her to call the Bank of America in connection with her property, but testified that either on the day or the day after she brought Mrs. Lewis home from the sanitarium, Mrs. Lewis "went to the bank herself and requested the man to come to the house. ... I took her to the bank, and she asked me to go out to the car and wait for her. Q. Then you don't know what transpired there? A. No. Q. When did these men *486 from the bank come out there to your house? A. Several days later. Q. Who were they? A. One is Mr. Kellerman. Q. Who was with him? A. He was alone. Q. Were you present at the conversation between them? A. No, I was not. I left the house. She told me there was nothing to do, and I went shopping. Q. When was the next time you saw Mr. Kellerman? A. Well, it was several days later. Q. Who was with him? A. A Mr. Marvin Glass. Q. Did they come to see Mrs. Lewis? A. They asked for Mrs. Lewis. ... Q. Did you inquire of them as to the nature of their business? A. I did not. ... I let them into the front room and called Mrs. Lewis. Q. Did you know Mr. Glass was an attorney? A. No, I did not. Q. Did you stay there during the conversation? A. I did not; I left the house again. Q. Did Mrs. Lewis ever tell you what conversation she had with these men? A. She did not. Q. Did you ever find out as to what her business with these men was? A. I found out since her death. ... Q. When was that? A. The day she died."
 Thereafter, on the 2d or 3d of August, 1942, respondent Kramer took Mrs. Lewis back to the latter's home with a nurse in attendance. Toward the latter part of August or the first of September, respondent Kramer began staying at Mrs. Lewis' home, but she did not move into said home until after Mrs. Lewis died.
 Respondent Sadie Lou Kramer in reply to the question: "You have stated you were a constant visitor at Mrs. Lewis' home before she entered the sanitarium, did you not?," stated, "Every day. ... When Mr. Lewis passed away there was nobody to be with her, and she asked me to stay until the funeral was over, and she made her own suggestion that this doctor had been caring for her for six months, thought she would go to his home, as the housekeeper she had was quitting and going back East. I couldn't leave my home, I had my obligations regarding my son. I stayed with her until she went to this rest-home at her request." This witness denied that she ever instructed "Dr. Herzen at the sanitarium not to allow any visitors to see Mrs. Lewis." She also denied that she kept the Francs from seeing Mrs. Lewis at her own home.
 Since the evidence produced on behalf of appellants failed to show any activity on the part of respondent Sadie Lou Kramer in the procurement of the will of August 1, 1942, it *487 was inadequate to prove undue influence in the execution of the will. (Estate of Arnold, supra.) The evidence being insufficient to show that the will of decedent was the result of influence on the part of said respondent, the court properly granted the motion for nonsuit.
 For the reasons stated, the order dismissing the petition to revoke the probate of the will is affirmed.
 Doran, J., and White, J., concurred.