[Civ. No. 15551. Second Dist., Div. One. Apr. 10, 1947.]

Estate of MAUDE R. RICH, Deceased. GEORGE G. AIT-KENHEAD et al., Appellants, v. MRS. CLARA WILLS et al., Respondents.

24

A. Brigham Rose, Ben C. Cohen and Leo Shapiro for Appellants.

Thomas J. Kelley and Vernon W. Hunt for Respondents.

WHITE, J.—On the morning of March 2, 1944, decedent Maude R. Rich, then 66 years of age, executed an holographic will by the terms of which her entire estate was bequeathed to Mrs. Clara Wills, who had been legally adopted when she was seven years of age, by decedent's mother. This holographic will was placed by decedent in her safety deposit box at the Bank of America at San Pedro, California, at 10 o'clock on the morning of the same day it was executed. Shortly thereafter the testatrix boarded a train at San Pedro, bound for Los Angeles, where at about noon of the same day she committed suicide by jumping out of the eighth story window of an office building in downtown Los Angeles.

On July 11, 1944, the aforesaid testamentary document was admitted to probate. On January 9, 1945, a written contest and opposition to the probate of said holographic will was filed by appellants herein, George C. Aitkenhead and Catherine Aitkenhead, praying that the probate of the aforesaid holographic will be revoked and that a will executed by decedent on December 1, 1943, be admitted to probate as the last will and testament of the decedent.

By the terms of this last-mentioned will, substantial devises and bequests were made to the aforesaid appellants George C. Aitkenhead and Catherine Aitkenhead, long time friends of the testatrix, and to appellant Norman Rich, a nephew of the testatrix' predeceased husband. Appellant Norman Rich also filed his written contest in opposition to the probate of the holographic will and also prayed for the admission to probate of the will dated December 1, 1943. In her will just mentioned, decedent also remembered with bequests other relatives and friends, as well as the Episcopal Church, of which she was a communicant.

Both the aforesaid contests were predicated upon the ground that at the time decedent executed the holographic will of March 2, 1944, she was not of sound and disposing mind.

Separate answers to both contests were filed by respondents Clara Wills and Bank of America National Trust and Savings Association, named as executor in the holographic will.

Following trial before a jury upon the issue of whether or not testatrix was of sound and disposing mind at the time she executed her holographic will on March 2, 1944, a special verdict was returned finding that at such time decedent was of sound and disposing mind. Accordingly, judgment was entered upon said special verdict, denying the petitions of appellants to revoke the probate of the aforementioned holographic will of March 2, 1944. Motions for a new trial were made by appellants and denied. From the judgment, and "from the verdict of the jury," this appeal is prosecuted.

The contentions of appellants are twofold: (1) That the trial court committed prejudicial error in "permitting lay witnesses called by respondents to testify that in their opinion decedent was competent on March 2, 1944 to make a valid will"; (2) that no sufficient foundation was laid to qualify such witnesses as "intimate acquaintances" within the rule (Code Civ. Proc., § 1870, subd. 10) permitting an intimate acquaintance to give an opinion concerning the soundness of mind of a decedent, and that objections made to the questions propounded to these witnesses as to the mental competency of decedent on March 2, 1944, should have been sustained.

As to the first of appellants' claims, the record reflects that the challenged question was as follows: "Do you have an opinion as to whether or not Maude Rich was mentally competent to make a valid will?" Appellants' objections to the question on the ground that it called for "a legal conclusion" was overruled. The ruling was erroneous. The latter part of the question "mentally competent to make a valid will," involving as it did a question of law and fact, was the identical question to be determined by the jury under instructions of the court. Subdivision 10 of section 1870 of the Code of Civil Procedure permits the asking of a subscribing witness to a will and also of an intimate acquaintance, questions eliciting the opinion of the witness as to the mental sanity of the person executing the testamentary instrument, the reasons for the opinion being given, but the question of competency is for the jury. In other words, when a witness has given an opinion as to the mental soundness of the decedent, the jury may judge the value or weight of such opinion

in the light of the reasons upon which it was based. And if, for instance, the opinion given was that the testator was not mentally sound, the next question for the jury to determine, if they deemed the opinion correct, would be whether such mental unsoundness affected the capacity of the testator to make a will. And in determining this question, the jury would have to be guided by the instructions of the court as to the nature and degree of mental unsoundness which would render the testator incapable of disposing of his property. In allowing a witness to answer the aforesaid question, the province of both the court and jury was invaded and the whole issue of law and fact was determined by the mere opinion of the witness. The vice of the question lies in the fact that capacity to make a will is not a simple question of fact, but is a conclusion which the law draws from certain facts as premises. In support of what we have herein stated there is a veritable forest of authorities, including *Estate of Taylor*, 92 Cal. 564, 567 [28 P. 603]; *Estate of Perkins*, 195 Cal. 699, 710 [235 P. 45]; *Estate of Short*, 7 Cal.App.2d 512, 523 [47 P.2d 555]; *In re Hill*, 13 Cal.App.2d 326, 329 [57 P.2d 155]; *Estate of Martin*, 170 Cal. 657, 668 [151 P. 138]; 10 Cal.Jur. 1002; *In re Lomax*, 224 N.C. 459 [31 S.E.2d 369, 155 A.L.R. 278].

■ Respondents insist that without objection from appellants similar testimony was elicited from Ben A. Hill, attorney for and close friend of the decedent. However, resort to the statement on appeal discloses that Attorney Hill was asked for and merely gave his opinion as to the mental capacity of the decedent on the day she executed the holographic will. This, as we have herein pointed out, is proper because such an opinion does not impinge upon the province of the jury to determine, under the instructions of the court, whether the decedent possessed the mental capacity sufficient in law to enable her to make a valid disposition of her property.

Respondents earnestly urge that the specific question with which we are here concerned received the imprimatur of the Supreme Court of this state in *Estate of Finkler*, 3 Cal.2d 584, 594 [46 P.2d 149]. We, however, do not regard the quotation of the court, taken from a decision of the prerogative court of New Jersey, that "It is proper and legal to ask a witness his opinion as to the mental capacity of the individual to discharge the duty in question," as intended to approve the asking of a question which seeks to elicit from the

witness an opinion as to whether, at the time the will was executed, the testator was possessed of the requisite mental capacity and intelligence that in law is deemed sufficient to enable him to make a valid disposition of his property.

Coming now to appellants' second contention that the witnesses Mattie Goodrich and Josie M. Davis were not sufficiently qualified to express an opinion as intimate acquaintances of the decedent, we are satisfied that such contention cannot be sustained. Both of these witnesses were old friends of the testatrix; they were on terms of social intimacy with her and in the case of Mattie Goodrich she discussed decedent's business affairs with her and as late as July, 1943, accompanied the latter in the collection of rents on her property. Mrs. Davis saw the decedent in January, 1944, and talked with her on February 29, 1944, only two days prior to the latter's death. We are satisfied that both witnesses were "intimate acquaintances" under any definition of that term as employed in the code section. Because it is difficult to lay down any definite rule as to what constitutes an "intimate acquaintance," it has been repeatedly held by the courts of this state that the determination of that fact, under the statute, must be committed to the sound discretion of the trial court, and when that court has determined, from their testimony, that given witnesses were "intimate acquaintances" and permitted them to express an opinion, an appellate tribunal will not interfere with the exercise of that discretion, unless there has been a clear abuse of it. A consideration of the evidence of the two witnesses here in question as reflected by the statement on appeal, precludes us from saying that there was any such abuse (*In re Wax*, 106 Cal. 343, 350, 351 [39 P. 624]; *Estate of Lenci*, 106 Cal.App. 171, 175 [288 P. 841]). The weight to be given the opinions expressed by these witnesses was of course a question for the jury to determine.

We must now determine whether, under the circumstances here present, the erroneous consideration by the jury of the testimony given in answer to questions to which objections were improperly overruled, assuming that such testimony was considered, resulted in appellants' suffering substantial injury; that a different result would have been probable if the testimony had been excluded, and that the erroneous ruling of the court upon the admission of the challenged testimony resulted in a miscarriage of justice (Cal. Const., art. VI,

§ 4½; Code Civ. Proc., § 475). The adoption of the constitutional provision just quoted abrogated the former rule that prejudice is presumed from an error of law.

The admission to probate of the holographic will of March 2, 1944, "established *prima facie* for all the purposes of the contest that it was duly executed in the manner required by law by a testator who was competent, free from undue influence, etc. The burden of proof was on the contestants to establish its invalidity" (*Estate of Baird,* 176 Cal. 381, 384 [168 P. 561]). Generally, the burden of proof as to the issue that decedent was not of sound and disposing mind is cast upon the contestant or the person who alleges such lack of mental capacity. It is only where the contestant has established a prima facie case of the absence of testamentary capacity that the proponent of the will has the burden of meeting it. And, until the contrary is established, testamentary capacity is always presumed to exist. The burden of showing affirmatively and by a preponderance of the evidence that *at the time* of executing the will the testatrix was of unsound mind and that such unsoundness of mind actually affected or controlled testamentary capacity rests upon the contestant. It is not a question of what *may* have been the testator's mental state at the time of the testamentary act, but what it *actually* was.

In the instant proceeding we are persuaded that the evidence taken as a whole leads overwhelmingly to the conclusion that by the verdict rendered herein there has been no miscarriage of justice; that were a retrial to be had there is no probability of a different result; and that under the aforesaid constitutional and code provisions the judgment cannot be disturbed.

At the trial, the appellants offered testimony that shortly before noon on March 2, 1944, testatrix committed suicide by jumping from an eighth story window of a downtown office building; that two days before her death the decedent was dissuaded from carrying out a threat of self-destruction; that on the last two Sundays preceding her death the decedent, while attending church services, "was in a highly nervous state. She murmured under her breath during the services. She seemed to be distracted about something"; that decedent was having considerable trouble with her eyes, was very discouraged about that condition; that one of the decedent's eyes had been removed many years before her death, since

which operation she had gone to San Francisco once or twice a year to an eye hospital in connection with the trouble she was experiencing with the sight of her remaining eye. It was further shown that during the last several years prior to her death decedent made several wills; that from time to time she changed the provisions in such testamentary instruments; that since July 2, 1936, up to February 21, 1944, some ten days before the execution of the holographic will and decedent's suicide, she had written a series of nine letters in one of which she wrote, "I had it out with myself in the still of last night and I know that I must stop worrying or something will snap in my brain. I have had a very bad spell with my nerves and my eye is not the best. I pray the good God in heaven to take care of me and to stop this worry." In another communication the testatrix stated "my great trouble is not sleeping—but I will try no more tricks. Do hope as time goes on you will forgive me and put it down to a mental crackup." That in the summer of 1943, decedent was seen on her front porch "shaking her fist in the air and talking aloud to herself and pointing and shaking her finger. There was no one there other than the decedent." Called as a witness for the contestants, her attorney who drew the previous wills for the decedent testified that at the time said wills were prepared and executed in 1937, 1939, January 11, 1943, July 9, 1943, July 30, 1943 and December 1, 1943, she was of sound and disposing mind. It was further established that at the time these wills were drawn decedent discussed her property with the attorney, the nature, location and extent of it. By a physician, appellants offered testimony that on December 7, 1943, decedent "was in a highly nervous state. I prescribed phenobarbital . . . I gave it to her to stabilize her nervous system." This physician further testified that when he saw the decedent on February 6, 1944, less than a month prior to the execution of the holographic will, "she seemed very highly nervous and seemed rather confused." It was shown at the trial that appellants Mr. and Mrs. Aitkenhead were not related to the decedent but were oldtime friends of hers, while the appellant Norman Rich was a half-nephew of the deceased husband of the testatrix. A qualified psychiatrist who had never known, seen nor heard of the testatrix in her lifetime, in answer to a lengthy hypothetical question, testified that in his opinion she was insane at the time she executed the holographic will on March 2, 1944.

In opposition to the foregoing, we have testimony given in behalf of the respondents at the trial that decedent managed her business and residential properties capably up to the very last; that she knew the names of and showed normal interest in her relatives; that appellants Mr. and Mrs. Aitkenhead were carrying on normal correspondence with decedent up to February 2, 1944; that up to practically the day of her death decedent was carrying on her regular social, church and club activities and attending to the maintenance and repair of her properties; that respondent Clara Wills, legatee under the holographic will, was the half-sister of decedent by adoption and a half-niece by blood; that in connection with the care and management of her property, decedent gave intelligent, accurate, business-like instructions to her gardener; that the expressed intention of decedent to commit suicide in the latter part of February, 1944, was not the first expression of such intention; that as far back as 1932, following the death of her husband and the removal of one of her eyes, she had indicated a like intention, saying, "she had nothing to live for."

It is fundamental that testamentary capacity exists when the testator understands the nature and situation of his property, recalls and understands his relation to the persons who have claims upon his bounty, and whose interests are affected by the provisions of the will (*Estate of Garvey,* 38 Cal. App.2d 449, 457 [101 P.2d 551]). We fail to find in the record herein any substantial evidence that decedent did not possess such understanding. It must be conceded that the testatrix was unquestionably in great distress and mental agony at the time she wrote her holographic will, and that it was written in contemplation of self-destruction. The fact that the testatrix was a suicide was properly received in evidence as tending to establish insanity, but there must be much more than the mere fact of suicide to show that the insanity was so complete as to destroy testamentary capacity. As was said by the Supreme Court in *Estate of Finkler,* 3 Cal. 2d 584, 595 [46 P.2d 149]: "So, again, it may be well and perhaps soundly reasoned that all persons who commit crime and that all persons who commit suicide are aberrant, abnormal, and therefore insane. But such is not the insanity which the law has in mind." Again, in the case just cited, it is said at page 596:

"Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix'

estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld (*Estate of Chevallier,* 159 Cal. 161 [113 P. 130]; *Estate of Wasserman,* 170 Cal. 101 [148 P. 931])."

The same case is authority for the statement that in order to invalidate a will mental derangement must be insanity in one of two forms: "(1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion." And furthermore, it must be shown that the abnormality of mind had a direct influence upon the testamentary act. Conceding that the testatrix understood her physical condition and was greatly worried, nervous and disturbed about it, such worry and concern was but natural and not an evidence of mental infirmity. In the instant case there is not even a suggestion that the decedent was the victim of any hallucinations or delusions.

Appellants concede that on December 1, 1943 (three months prior to her death), when decedent executed the will for which appellants sought admission to probate, she was of sound mind and possessed of testamentary capacity. There is no evidence to indicate any change in her mental capacity thereafter and until her death. The evidence shows without contradiction that on the morning of her death, when she executed the holographic will, the testatrix was keenly aware of what she was doing, and was very methodical in what she did. She knew exactly what time her bank opened that morning and appeared there promptly at the opening hour of 10 o'clock. Proceeding to the safety deposit department of the bank she deliberately and correctly signed the paper entitling her to access to her safety deposit box, signing her name in clear and steady handwriting. She then placed in her safety deposit box the will here under consideration. She enclosed the testamentary document in an envelope addressed to the manager of the bank which she had named executor.

A photostatic copy of the will has been brought here on this appeal and an inspection of the physical characteristics of the same, the addressed envelope in which it was enclosed, and the safety deposit admission slip bear mute but impres-

sive and convincing evidence that it was not prepared by one bereft of the competency required by law for the legal execution of a testamentary instrument. It is titled ''My last will,'' is dated, declares the maker to be ''of sound mind and no undue influence being used,'' the name and address of the beneficiary is given, and an executor is nominated. No nervousness or trembling on the part of the testatrix is apparent in the document. The following language of a trial court, quoted with approval in *Estate of Arnold,* 16 Cal.2d 573, 589 [107 P.2d 25], is particularly pertinent to the cause now engaging our attention: ''The will is a perfectly natural will and bears no evidence upon its face of any mental weakness of the testator, much less anything amounting to mental incapacity in a legal sense. On the contrary it is convincing evidence of his testamentary capacity, for it contains within itself direct evidence of every element of competent ability in this regard.'' Furthermore, the holographic will here in question is a perfectly natural will. The sole beneficiary thereunder is the sister of the testatrix by adoption, but she was also actually a blood relative of the decedent by reason of the fact that decedent and the beneficiary's mother were half-sisters by blood, being born of the same mother. On the other hand, appellants Mr. and Mrs. Aitkenhead were but old-time friends of the testatrix, while appellant Norman Rich was a half-nephew of the deceased husband of the testatrix.

We are not unmindful of the testimony of the physician, and psychiatrist who, while he had never seen the decedent, declared under the promptings of a hypothetical question, too long to be here repeated, his belief that the testatrix was insane at the time she executed her holographic will, but his testimony must be construed in connection with the other evidence in the case which showed that the testatrix attended to her ordinary business, managed her properties, collected the rents thereon, directed the activities of her employees in the maintenance and upkeep of her properties, and was actively interested in church and club work. The type of evidence given by the psychiatrist in the instant case was thus characterized in *Estate of Dolbeer,* 149 Cal. 227, 243 [86 P. 695, 9 Ann.Cas 795]: ''The witnesses were skilled alienists, it may be conceded, but the evidence thus adduced of one who has never seen the person and who bases his opinion upon the facts given in a hypothetical question is evidence the weakest and most unsatisfactory. Such questions themselves are al-

ways framed with great particularity to meet the views of the side which presents the expert. They always eliminate from consideration the countervailing evidence which may be of a thousand-fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose, and that purpose never is the presentation of all the evidence. It is never to present the fair and accurate view, but the purpose always is to frame a question such that the answer will announce a predetermined result. This kind of expert testimony, given under such circumstances, even the testimony of able and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value.'' Furthermore, there was no showing in the testimony of the psychiatrist that the insanity, with which in his opinion testatrix was afflicted, was of such a character that except for it she would have divided her property in a way other than she actually did. In other words, the testimony of the alienist did not establish the fact that the abnormality of mind which he ascribed to the testatrix had a direct influence on her testamentary act when she executed her holographic will.

 Taking all the evidence adduced by appellants as true, it falls far below the requirements of the law as constituting satisfactory rebuttal of the inference of testamentary capacity, the existence of which is destroyed only when it is satisfactorily shown that a testator was unable to understand and carry in mind the nature and situation of his property and his relation to his relatives and those around him, with clear remembrance as to those in whom and those things in which he has been mostly interested, incapable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty. Applying the rule hereinbefore referred to to the facts disclosed by the record herein, and on the authority of a multitude of cases, including *Estate of Chevallier*, 159 Cal. 161 [113 P. 130]; *Estate of Little*, 46 Cal.App. 776 [189 P. 818]; *Estate of Gould*, 188 Cal. 353 [205 P. 457]; *Estate of Dolbeer, supra; Estate of Garvey*, 38 Cal.App.2d 449 [101 P.2d 551]; *Estate of Schwartz*, 67 Cal.App.2d 512 [155 P.2d 76]; *Estate of Lewis*, 64 Cal.App.2d 480 [149 P.2d 51]; *Estate of Finkler*, 3 Cal.2d 584 [46 P.2d 149]; *Estate of Arnold*, 16 Cal.2d 573 [107 P.2d 25]; *Estate of Agnew*, 65 Cal.App.2d 553 [151 P.2d 126]; *Estate of McGuirk*, 50 Cal.

App. 352 [195 P. 279]; *Estate of Johanson*, 62 Cal.App.2d 41 [144 P.2d 72]; *Estate of Morey*, 75 Cal.App.2d 628 [171 P.2d 131]; *Estate of Peterkin*, 23 Cal.App.2d 597 [73 P.2d 897], and *Estate of Wright*, 7 Cal.2d 348 [60 P.2d 434], it must be held that a judgment founded upon any other verdict than the one rendered herein would not be supported by the evidence.

 The aforesaid erroneous rulings of the trial court permitting the introduction of inadmissible evidence cannot therefore be held to have resulted in a miscarriage of justice, nor can it be said that a different verdict might have ensued but for the hereinbefore noted errors of law. Under the provisions of the Constitution of California, article VI, section 4½, and section 475 of the Code of Civil Procedure, the judgment rendered herein cannot be disturbed.

The attempted appeal from the verdict of the jury is dismissed. The judgment is affirmed.

York, P. J., and Doran, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 29, 1947.